THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM A. McDANIEL, Defendant-Appellant.

Fourth District   No. 4—83—0412

Opinion filed July 19, 1984.

Asher O. Geisler, of Decatur, for appellant.

Basil G. Greanias, State's Attorney, of Decatur (Robert J. Biderman and Perry Lee Miller, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

At night on February 9, 1983, two sheriff's deputies stationed themselves inside the defendant's house because they had received a

tip that a burglary might be attempted there. After a series of misunderstandings the defendant, though he had met one of the deputies and been told of the plan, became convinced that the deputies were the expected burglars. The defendant chased them from his home, firing a gun at one of them. The defendant was then charged with attempted murder and aggravated assault, convicted of those charges in a jury trial, and sentenced to seven years' imprisonment on the more serious offense. We conclude that the State proved beyond a reasonable doubt that the defendant was not justified in using deadly force but that incorrect jury instructions entitle the defendant to a new trial.

Sheriff's deputies John Montgomery and Samuel Baum testified at the defendant's trial about their attempt to protect the defendant's house from burglars.

On February 8, 1983, the Macon County Sheriff's Department got a tip from the Decatur Police Department that a collection of firearms was going to be stolen from a house located somewhere outside Decatur. Deputy Montgomery, an investigator, knew that the defendant collected guns and believed that he might be the intended victim. That night Montgomery and two other deputies sat in a car and watched the defendant's house; nothing happened.

According to Montgomery, the next night he decided to station himself inside the defendant's house. At 8 p.m. he went there in mufti, showed the defendant his identification, and told the defendant about the planned theft. The defendant acknowledged that he owned a collection of guns. They agreed on a schedule for the evening: the defendant would go and visit his sick sister while Montgomery stayed in the house; when the defendant got back, Montgomery would drive to Decatur to pick up his partner and then return to the defendant's house to resume surveillance. First, though, Montgomery moved his car, which was unmarked, from the defendant's driveway to a less conspicuous place, a nearby church. Montgomery was gone for 10 to 15 minutes; when he returned, the defendant appeared upset and insisted on inspecting Montgomery's identification again. The defendant explained that earlier that day someone had entered the house and taken an envelope containing $500. While the defendant recounted that incident he was holding part of his gun collection, a 9-shot, .22-caliber pistol. The defendant said that the money had been in a bank envelope. Montgomery noticed an envelope in the defendant's shirt pocket, and the defendant opened it and found the missing money. The defendant set the cocked pistol on the kitchen table, and it went off accidentally, hitting a wall.

Montgomery testified that the defendant then left to visit his sister, taking the gun with him. Montgomery telephoned his supervisor. Detective Samuel Baum soon arrived; like Montgomery, he was in mufti. They sat in the kitchen in the dark, with lights burning in other rooms of the house. About midnight the defendant returned, slowly and cautiously entering by the back door. The defendant asked who Baum was, and Montgomery introduced him. Montgomery's and Baum's service revolvers were in their holsters. The defendant asked to see Baum's identification card and displayed the gun that he had taken with him. As Baum started to proffer his card, the defendant fired a shot into the kitchen floor. Montgomery and Baum scattered. The defendant fired six or eight more times toward the front of the house, which was the direction in which Baum had run. The defendant yelled at Baum, threatening to kill him and ordering him to leave the house. Baum, fearing for his life, eventually escaped through the front door, which did not open the first two tries. Montgomery, who after the first shot had retreated to a spot somewhere off the kitchen, left the house by the back door.

Montgomery and Baum regrouped outside; they could see the defendant in the kitchen, reloading his gun and talking on the telephone. Montgomery stepped in the back door; the defendant, through a telephone conversation with the sheriff's department, was able to confirm the identities of Montgomery and Baum and their purpose in being at his house. The defendant then let them inside. Montgomery and Baum testified that they did not fire their service revolvers.

The defendant testified, and his version of the events followed the same general chronology given by Montgomery and Baum but disagreed with their testimony on several important points. The defendant, who was 72 years old at the time of trial, explained that he began to suspect Montgomery because he was not in uniform. Montgomery told him that the house had been watched the previous night, but the defendant doubted it, for his neighbors would have noticed something like that and had not mentioned anything. The defendant believed that Montgomery was trying to set him up to steal his gun collection.

The defendant testified that several unusual events quickly confirmed his suspicions. Told about the missing money, Montgomery returned it by putting a bank envelope in the defendant's shirt pocket. Also, the defendant thought that Montgomery was lying when he said that the minister had given him permission to park his car at the church; according to the defendant, the minister is at the church only on Sundays and these events occurred on a weekday. As the defend-

ant was about to leave for his sister's house, he asked Montgomery whether he should transport his gun by removing the ammunition and locking the weapon in the trunk; Montgomery said that that would be the safest way, which the defendant did not believe.

The defendant then drove to the homes of some friends and relatives; several of these persons were not at home. He did see his sister and her 20-year-old son, though. The defendant feared for his nephew's safety and told him to stay home. The defendant did not report his suspicions to the sheriff's office during this time because his complaints had been ignored in the past.

The defendant testified that on returning from Decatur he saw that Montgomery's car was still parked at the church. The car was unmarked and did not look like a law enforcement vehicle. The defendant drove to a neighbor's house and parked his car there. He thought that he saw two men carrying guns out of his house. The defendant retrieved his gun from the trunk, loaded it, and advanced on his house. Carefully, he entered through the back door; he saw a stranger—Baum—in the kitchen with Montgomery. The stranger refused to provide any identification. The defendant was puzzled, for Montgomery had said earlier that he would have to go back to Decatur to pick up his partner, yet now he was saying that the stranger in the house was the partner. The defendant told the two men to leave, but they grabbed his arms instead. The defendant managed to pull his pistol from his belt and fired it, intending only to scare them. They ran and eventually escaped from the house. Baum shot at the defendant from outside. The defendant testified that he could have killed Baum and Montgomery had he wanted to. Defense counsel did not present any other evidence.

In rebuttal, Montgomery and Baum denied stealing from the defendant or grabbing his arms. Another member of the sheriff's department testified that his examination of the two deputies' service revolvers shortly after these events occurred revealed that they had not been fired.

The defendant raises two major arguments on appeal: that the State failed to prove that he was not justified in using deadly force in defense of himself and his dwelling, and that the jury was incorrectly instructed on the mental state necessary to sustain a charge of attempted murder. The first argument pertains to the sufficiency of the evidence, and the second argument pertains to the conduct of the trial; therefore, the defendant's constitutional guarantees against double jeopardy require that we address the first argument regardless of our resolution of the second. *Burks v. United States* (1978), 437 U.S.

1, 57 L. Ed. 2d 1, 98 S. Ct. 2141; *Greene v. Massey* (1978), 437 U.S. 19, 57 L. Ed. 2d 15, 98 S. Ct. 2151; *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.

■ The defendant first argues that he was not proved guilty beyond a reasonable doubt of the offenses of attempted murder and aggravated assault. He renews the affirmative defense that he relied on at trial: that he justifiably used deadly force in defending himself and his dwelling.

A person may use deadly force in self-defense "only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony" (Ill. Rev. Stat. 1981, ch. 38, par. 7—1). A person may use deadly force to terminate an entry into a dwelling "only if: *** (b) He reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling" (Ill. Rev. Stat. 1981, ch. 38, par. 7—2). The reasonableness of these beliefs is a question of fact. *People v. Henry* (1980), 86 Ill. App. 3d 602, 408 N.E.2d 228; *People v. Nichols* (1974), 21 Ill. App. 3d 432, 315 N.E.2d 663.

The State presented sufficient evidence of the unreasonableness of the defendant's twin beliefs that force was necessary to defend himself and his home. Montgomery testified that he twice showed his identification to the defendant; this should have allayed the defendant's fears. The deputies did nothing to suggest that they were going to either harm the defendant or commit a felony. Whatever threat they presented was not imminent: they did not remove their service revolvers from their holsters until after the defendant started shooting—the defendant does not assert the separate theory that he justifiably used force despite being the aggressor (Ill. Rev. Stat. 1981, ch. 38, par. 7—4). The jury was free of course to reject the defendant's testimony of what substantiated his fears: for example, that Montgomery returned rather than helped find the missing bank envelope with its money and that the two deputies grabbed and restrained his arms. Our decision here does not, however, bind the court on retrial. *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.

■ We must consider next the defendant's alternative argument that reversible error occurred when the jury was incorrectly instructed on the mental state necessary for attempted murder. The jurors were told in a definitional instruction that murder occurs when a person "intends to kill or do great bodily harm," and they were told in an issues instruction that to prove the offense of attempted murder the State had to prove that the defendant "attempted to kill or do great bodily harm." The first was Illinois Pattern Jury Instruction

(IPI), Criminal, No. 7.01 (2d ed. 1981), with some of but not all the inappropriate material deleted. The second was a hybrid derived from IPI Criminal No. 7.02, which is the issues instruction for murder. There is no instruction in the IPI Criminal series for attempted murder as such; rather, IPI Criminal No. 6.07, "Issues in Attempt," may be used in conjunction with the correctly limited definition of "murder" from IPI Criminal No. 7.01 (see IPI Criminal No. 27.02 (sample set of instructions for attempted murder)).

The State agrees with the defendant that attempted murder is a specific intent crime and that only proof of intent to kill will suffice; thus, neither the definitional nor the issues instruction should have contained the words, "or do great bodily harm." (*People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888.) We note that the information charging the defendant with attempted murder correctly alleged only the intent to kill.

The State argues that the error has been waived. Although the defendant's post-trial motion was to raise the question eventually, the issues instruction on attempted murder was offered by defense counsel to correct a deficiency in the State's proposal, which did not refer to the justifiable use of force, and defense counsel did not object to the definitional instruction. Normally this would result in waiver. *People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248; *People v. Kelley* (1969), 105 Ill. App. 2d 481, 244 N.E.2d 818.

The defendant argues that the waiver rule should not be applied here, for the evidence was closely balanced and the right instructions could have led to his acquittal rather than conviction for attempted murder. Under Supreme Court Rule 451(c) (87 Ill. 2d R. 451(c)), substantial defects in jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require."

In *People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861, the defendant, on trial for deceptive practices, failed to make a timely objection to an issues instruction that did not refer to the intent to defraud, which is an element of the offense. The defendant's mental state was at issue in his trial. The supreme court held that the error was not waived and warranted a new trial. Discussing waiver and instructional error, the court said:

> "The interests of justice demand that the rule of waiver be modified, in criminal cases, where necessary to ensure the fundamental fairness of the trial. (*People v. Roberts* (1979), 75 Ill. 2d 1, 15; *People v. Parks* (1976), 65 Ill. 2d 132, 137.) Fundamental fairness includes, among other things, seeing to it that certain basic instructions, essential to a fair determination of

the case by the jury, are given. Instructions on the elements of the offense are among these basic instructions, and we have recognized that the trial court has responsibility for ensuring that they are given. (*People v. Roberts* (1979), 75 Ill. 2d 1, 13.) The failure correctly to inform the jury of the elements of the crime charged has been held to be error so grave and fundamental that the waiver rule should not apply. (*People v. Jenkins* (1977), 69 Ill. 2d 61, 66-67; *People v. Davis* (1966), 74 Ill. App. 2d 450; *People v. Lewis* (1969), 112 Ill. App. 2d 1.) It is of the essence of a fair trial that 'the jury not be permitted to deliberate a defendant's guilt or innocence of the crime charged without being told the essential characteristics of that crime.' *People v. Lewis* (1969), 112 Ill. App. 2d 1, 11." 87 Ill. 2d 216, 222, 429 N.E.2d 861, 864.

■ Here, the trial court failed to ensure that the jury was correctly instructed on the elements of attempted murder. Furthermore, under the circumstances in this case, the error was prejudicial. The specific problem with the instructions used here is that they "permit-[ted] the jury to return a verdict of guilty upon evidence that the defendant intended only to cause great bodily harm short of death. An instruction must make it clear that to convict for attempted murder nothing less than a criminal intent to kill must be shown." (*People v. Harris* (1978), 72 Ill. 2d 16, 27, 377 N.E.2d 28, 33.) Whether the defendant had formed the necessary intent to kill was a major theme at trial, variously shown and negated by both circumstantial and direct evidence of the defendant's threats, marksmanship, and self-restraint. Intent was also stressed in closing argument. Thus, the defendant's mental state was at issue, and the incorrect instructions could have led the jury to convict the defendant of attempted murder for less than intent to kill. *Cf. People v. Jones* (1979), 81 Ill. 2d 1, 405 N.E.2d 343 (in prosecution for attempted murder, use of definitional instruction containing incorrect mental states was harmless error, for intent to kill was not at issue).

■ Because the defendant may be tried again, we shall discuss briefly a question that may recur: the defendant objects to certain language in the instructions used below on self-defense and defense of dwelling. These instructions, IPI Criminal Nos. 24—25.06 and 24—25.07, speak of force that "is intended or likely to cause death or great bodily harm," and the defendant would take out the phrase, "or great bodily harm," to make them consistent with the correct instructions on attempted murder. The reference to great bodily harm has a different, unobjectionable function here, however, for it serves to de-

fine the type of force—deadly—used by a defendant and not his essential mental state.

■ The defendant also argues that trial counsel—different from counsel on appeal—was ineffective. The defendant bases this argument on two aspects of the trial: the problems with the instructions, and defense counsel's failure to call as a witness the nephew whom the defendant visited during the night in question. The defendant believes that the nephew's testimony could have confirmed his own about his state of mind that night. The decision whether to have a particular person testify is generally a part of trial strategy (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677), and trial counsel may have had the reasonable belief that the defendant's testimony would be more effective if it were not juxtaposed with another witness's. The defendant does not suggest that defense counsel failed to question potential witnesses. The problems with the instructions are limited to the conviction for attempted murder, which we have already decided to grant the defendant a new trial on. Examination of the record discloses that trial counsel conducted a vigorous and able defense; failure to have the defendant's nephew testify did not amount to substantial prejudice having a probable effect on the outcome of the trial. *People v. Royse* (1983), 99 Ill. 2d 163, 457 N.E.2d 1217.

■ We have jurisdiction over both convictions even though the defendant was sentenced on only one of them. (*People v. Garcia* (1983), 97 Ill. 2d 58, 454 N.E.2d 274; *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180; *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1.) For the reasons indicated we reverse the defendant's conviction and sentence for attempted murder; because the error in the conviction for attempted murder does not pertain to the defendant's conviction for aggravated assault, the latter is affirmed. (See *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838 (a single act may support only a single conviction).) The cause is therefore remanded, and the trial court is directed to impose sentence on the defendant's conviction for aggravated assault (*People v. Garcia* (1983), 97 Ill. 2d 58, 454 N.E.2d 274; *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180) or, in the alternative, on the motion of the State, to vacate that judgment and to retry the defendant for attempted murder.

Affirmed in part, reversed in part, and remanded.

TRAPP and WEBBER, JJ., concur.