THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
FEMI OKUNDAYE, Defendant-Appellant.

First District (5th Division)   No. 1—86—3415

Opinion filed September 29, 1989.

MURRAY, P.J., and COCCIA, J., specially concurring.

Randolph N. Stone, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Craig J. Jensen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

A jury found defendant, Femi Okundaye, guilty of attempted murder and guilty of possession of controlled substances, heroin and cocaine, with intent to deliver. The trial court sentenced defendant to concurrent eight years' imprisonment terms. On this appeal the defendant claims for reversal that (1) the trial court erred in instructing the jury that it could find defendant guilty of attempted murder upon a finding that defendant intended to do great bodily harm; (2) the evidence failed to establish his guilt beyond a reasonable doubt of attempted murder; (3) his conviction and sentence for possession of controlled substances with intent to deliver should be reduced to mere possession of controlled substances; and (4)(a) the prosecutor's opening statement to the jury, (b) the voluminous irrelevant, prejudicial, inadmissible evidence, and (c) the prosecutor's capacious argument to the jury on the facts and circumstances surrounding the issuance of the search warrant denied the defendant a fair and impartial trial. We

reverse and remand for a new trial for the following reasons.

The State's trial evidence established that Chicago police officer Richard Rowan, the alleged attempted murder victim, and 10 additional Chicago police officers went to 1110 West 50th Street, Chicago, Illinois, to execute a search warrant for narcotic drugs. The officers knocked on the apartment door and announced their office. Officer Rowan testified that he heard a commotion inside the premises which sounded to him like someone running. Rowan smashed into the apartment door with a battering ram and gained entry into the apartment.

Upon entering the apartment, Officer Rowan related that he saw the defendant run up the stairs to the second floor. Officer Rowan stated that he yelled, "police officer," drew his weapon and ran up the stairs in pursuit of the defendant. Upon arriving at the top of the stairs, Officer Rowan stated that he saw the defendant, at the end of a hallway, cross over from one bedroom into another. Rowan ran down the hallway to the bedroom door that the defendant had entered. The bedroom door was partially open. Rowan related that the defendant was in a crouched stance behind the door with a gun in his hand pointed at Officer Rowan's head, and that the defendant struck him in his face with the gun. Officer Rowan further stated that he attempted to knock the defendant's gun away but that defendant continued to point the gun at his head and simultaneously grabbed Officer Rowan's gun with his left hand. It was at this time, Officer Rowan testified, that he shot the defendant in his abdomen. Officer Rowan testified on cross-examination, however:

"Q. You also had occasion to make a report of this, did you not?

A. Yes.

Q. I ask you to take a look at that. Do you recognize what Defense Exhibit No. 9 for identification is, Officer?

A. Yes, this would be the second page of a case report, on a vice case report.

Q. Who is the author of it?

A. If you mean who typed it, I am not sure, probably Officer Ramirez.

Q. Is the name of Richard Rowan on that report?

A. Yes, it is.

Q. Did you tell Officer Ramirez what was in—what to put in this report?

A. Yes.

Q. Anywhere in this report, officer, is it that you were hit in the face with the defendant's gun?

A. No.

Q. Is it anywhere in this report, in your report, did you say that the defendant was crouched?

A. No.

Q. Is it anywhere in this report that you state that the defendant grabbed your gun?

A. Not in the narcotics report, no.

Q. Is it in any report that you made did you make mention of the fact on any reports that you made, did you make a report of the fact that the defendant grabbed your gun?

[Assistant State's Attorney]: Object, Your Honor, to the form of the question.

THE COURT: He can answer the question, did you write any reports wherein you indicated that the defendant had grabbed your gun, is that correct Mr. [defense attorney]?

[Defense Attorney]: Yes, Judge.

A. That is the only report I prepared, all the other reports were prepared by the detectives.

[Defense Attorney]: Q. So, is it true, officer that the answer is no, I did not make a report that contained those answers?

A. I made no other reports, no."

A brief struggle ensued between Officer Rowan and the defendant until the other officers, who were immediately following behind Officer Rowan by five or six feet, arrived and assisted Rowan in subduing the defendant. Officer Rowan yanked the gun out of the defendant's hand.

The officers searched and seized from the defendant's person a plastic bag containing 7.71 grams of heroin and another plastic bag containing .45 grams of cocaine. In the bedroom across the hallway from the bedroom in which Officer Rowan shot the defendant, the officers found an Illinois Bell Telephone bill in the name and address of Femi Okundaye, apartment 11, 1110 West 50th Street, a triple-beam scale used to measure cocaine and heroin, a glass pipe used to smoke cocaine, a hypodermic needle used for the intravenous injection of heroin, and two plastic bags of 49.85 grams and .55 grams of cocaine, respectively.

Officer Michael Duffin examined the gun that Officer Rowan said the defendant pointed at his head. Duffin stated that the cylinder of the gun had three live rounds in three of the five chambers; that the chambers directly in front of and directly to the left of the firing pin were empty and the gun could be fired only by pulling the trigger

three times for firing.

Mary Cook, a defense witness, testified that she was in the apartment and that the defendant was in the bathroom on the second floor when the police entered.

The defendant also testified that he was in the second-floor bathroom when the officers entered the apartment and ran up the stairs to him. The defendant related that one of the officers rushed up to him, pointed a gun at his stomach and asked him for the "money and dope." Defendant asked the officer if he had a search warrant. With his teeth clenched, the officer angrily responded, "This is my search warrant," referring to the gun the officer had pointed at defendant's abdomen. The officer shoved the gun into defendant's abdomen. The officer further pressed his gun against the defendant's abdomen and it went off. The defendant fell wounded to the floor, and as he was lying there, the officer tried to put a gun in his hand and told him, "If you don't hold it—do you want to be shot again?" The defendant denied that he ever had a gun in his possession.

On rebuttal, Assistant State's Attorney Stuart Palmer testified that he questioned defendant at the hospital after the defendant's surgery there for his gunshot wound, that the defendant initially denied that he owned the gun, but later admitted the gun belonged to him. Palmer admitted that the defendant's post-surgery statement was never reduced to writing, that he did not tell the defendant that he could end his questioning when he desired and that his interrogation of the defendant terminated when the defendant's attorney arrived at the hospital.

We initially *sua sponte* note that count I of the indictment, the purported attempted murder count, alleges in pertinent part, that:

> "[O]n or about May 7, 1985, at and within the County of Cook Femi Okundaye committed the offense of attempt in that he without lawful justification with intent to commit the offense of murder, intentionally and knowingly attempted to kill Richard Rowan by pointing a loaded handgun into his face, in violation of Chapter 38, Section 8—4/(38—9—1) of the Illinois Revised Statutes 1983 ***."

Said chapter 38, section 8—4(a), of the Illinois Revised Statutes (1983) alleged in count I to have been violated by the defendant defines "attempt" as follows:

> "A person commits an attempt when, with intent to commit a specific offense, *he does any act which constitutes a substantial step toward the commission of that offense.*" (Emphasis added.) Ill. Rev. Stat. 1983, ch. 38, par. 8—4(a).

Count I of the instant indictment failed to allege that the defendant committed "any act which constitutes a substantial step toward the commission of that [attempt murder] offense." Our research does not reveal a single case of appellate review of a conviction for attempted murder in which the indictment or information failed to allege (1) "that the defendant committed '[an] act which constitute[d] a substantial step toward the commission of that offense'; and (2) the specific act which constituted the substantial step toward the commission of the attempted murder offense." Our research reveals that in every case of appellate review of an attempted murder conviction, the indictment or information alleged that the defendant committed an act which constituted a substantial step toward the commission of the attempted murder, and also alleged the specific act committed by the defendant which constituted the substantial step toward the commission of the attempted murder. (*People v. Roberts* (1978), 56 Ill. App. 3d 667, 372 N.E.2d 143, *rev'd on other grounds* (1979), 75 Ill. 2d 1, 387 N.E.2d 331; *People v. Harris* (1978), 72 Ill. 2d 16, 19-20, 377 N.E.2d 28; *People v. Muir* (1977), 67 Ill. 2d 86, 90, 365 N.E.2d 332; *People v. Trinkle* (1977), 68 Ill. 2d 198, 199-200, 369 N.E.2d 888; *People v. Viser* (1975), 62 Ill. 2d 568, 581, 343 N.E.2d 903.) The supreme court in *People v. Jones* (1979), 81 Ill. 2d 1, 8-9, 405 N.E.2d 343, specifically held:

"The offense of attempted murder requires the mental state of specific intent to commit murder, to kill someone. Section 8—4(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 8—4(a)) clearly sets this out: 'A person commits an attempt when, with intent to commit a specific offense, *he does any act which constitutes a substantial step toward the commission of that offense.' Knowledge* (emphasis in original) that the consequences of an accused's act many result in death (or grave bodily injury), or *intent to do bodily harm, is not enough; specific intent to kill is required (People v. Trinkle* (1977), 68 Ill. 2d 198, 201-04). *Both the indictment and the instruction must unambiguously reflect this.*" (Emphasis added.)

The instant indictment alleged that the defendant "attempted to kill Richard Rowan by pointing a loaded handgun into his face." But the indictment does not allege that such act was an act or was the act which constituted a substantial step towards the defendant's commission of the alleged attempted murder. Nor does the indictment allege, as beforestated, that any act, or what act was committed which constituted a substantial step towards the defendant's commission of the offense. The mere pointing of a loaded gun into Rowan's face does

not establish *per se* an intent to kill Rowan, and likewise, the mere pointing of a loaded gun in Rowan's face does not necessarily *per se* constitute a substantial step towards the commission of attempted murder, particularly in the total absence of an allegation that such act did so.

Because the validity of count I has not been briefed and argued by the parties before us, and also because we reverse the defendant's attempted murder and possession of controlled substances with intent to deliver convictions on other grounds, and remand for a new trial, we decline to resolve the question of the validity of count I.

The defendant argues that the trial court erroneously instructed the jury that it could find the defendant guilty of attempted murder even if the jury only found that the defendant only intended to do great bodily harm to Rowan.

The indictment charged the defendant with the offense of attempted murder of Richard Rowan, as previously set forth. "Murder" is defined in section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2)) as follows:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual ***."

"Attempt" is defined in section 8—4 (Ill. Rev. Stat. 1983, ch. 38, par. 8—4(a)), as previously set forth.

A defendant's specific intent to kill is an essential element of the offense of attempted murder, and it must be proven beyond a reasonable doubt. *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888; *People v. McDaniel* (1984), 125 Ill. App. 3d 694, 466 N.E.2d 662.

In the case at bar, the trial court gave the jury three instructions which governed and controlled its deliberations on the attempted murder charge. Even though no act which constituted a substantial step towards the commission of the attempted murder was alleged, the trial court nevertheless instructed the jury on attempt, as follows:

"A person commits the offense of attempt when he, with the intent to commit the offense of murder, *does any act which constitutes a substantial step toward the commission of the offense of murder*. The offense attempted need not have been committed." (Emphasis added.)

The trial court instructed the jury on murder, as follows:

"A person commits the offense of murder when he kills an individual without legal justification if in performing the acts which caused the death he intended to kill *or do great bodily harm to that individual.*" (Emphasis added.)

The trial court instructed the jury on the attempted murder issues, as follows, although, as stated, no act constituting a substantial step toward the commission of the attempted murder offense was alleged.

"To sustain the charge of attempt the State must prove the following propositions: First, *the defendant performed an act which constituted a substantial step toward the commission of the offense of murder,* and second, that the defendant did so with the intent to commit the offense of murder.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphasis added.)

Thus, the defendant contends, the jury was instructed that it could find the defendant guilty of attempted murder on a finding that the defendant intended to kill Richard Rowan, but that the jury was also additionally, but erroneously, instructed that it could likewise find the defendant guilty of attempted murder on the jury's alternative finding that the defendant solely intended to do only great bodily harm to Richard Rowan, and even though the jury might also find that the defendant did not intend to kill him.

The evidence was far from overwhelming that the defendant intended to kill Officer Rowan. Indeed, such evidence was quite vulnerable, vincible and assailable, as we later herein more specifically observe. Defendant had an absolute right to have the jury determine by accurate governing instructions whether he acted with or was guilty of the specific intent to kill Officer Rowan.

It has been long and well settled that an instruction to a jury that it may find a defendant guilty of attempted murder upon its finding that the defendant intended to do great bodily harm is erroneous reversible error. *People v. Harris* (1978), 72 Ill. 2d 16, 24, 26-27, 377 N.E.2d 28; *People v. Trinkle* (1977), 68 Ill. 2d 198, 201, 204, 369 N.E.2d 888; *People v. Gentry* (1987), 157 Ill. App. 3d 899, 903-04, 905-06, 510 N.E.2d 963; *People v. Cantu* (1987), 157 Ill. App. 3d 934,

937-38, 510 N.E.2d 1183; *People v. McDaniel* (1984), 125 Ill. App. 3d 694, 701, 466 N.E.2d 662.

The State argues that because defendant did not object to the instructions or rely on their invalidity on his motion for a new trial, the defendant waived the issue on appeal. Conversely, the defendant argues that because of the grave error of the erroneous instruction, because the jury was not correctly instructed on this evidentiary factually close case and/or on the defendant's intent to kill, fundamental fairness required that the jury be properly instructed and that the waiver rule should therefore not apply. Moreover, the defendant urges that inasmuch as the erroneous instruction and the failure to correctly instruct the jury on the fragile evidence of the defendant's guilt, the error affects the defendant's substantial rights and should be considered by this court as plain error under Illinois Supreme Court Rule 615(a). We agree. *People v. Ogunsola* (1981), 87 Ill. 2d 216, 222, 429 N.E.2d 861; *People v. Harris* (1978), 72 Ill. 2d 16, 28, 377 N.E.2d 28; *People v. Gentry* (1987), 157 Ill. App. 3d 899, 510 N.E.2d 963; *People v. McDaniel* (1984), 125 Ill. App. 3d 694, 466 N.E.2d 662.

In *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 182, 415 N.E.2d 1027, the supreme court held that an exception to the waiver rule is contained in Rule 451(c), which permits the review of substantial defects in instructions if the interests of justice require, to correct grave errors or the case is close factually, and fundamental fairness requires that the jury be properly instructed. We hereafter note that the instant case is close factually, and as the supreme court held in *People v. Joyner* (1972), 50 Ill. 2d 302, 307, 278 N.E.2d 756:

> "[T]he defendants' failure to tender the appropriate *** instruction was not as important with reference to the fundamental fairness of their trial as the requirement that the jury be fully and properly instructed. The failure to [properly] instruct on this important aspect of the case necessitates a remand for a new trial."

The State's reliance on *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331, is grossly misplaced. In *Roberts*, the defendant and his witness both admitted that the witness fired a shot from a powerful, .357 magnum Colt revolver in the door of a passing truck. The shot was fired directly in line with the truck driver's body, from the rear seat of the automobile driven by the defendant because she was disturbed when the passing truck awakened her from her nap. Roberts did not object to the "great bodily harm" instruction on his trial for attempted murder. Nor did he raise the issue instruction on his motion for a new trial. The supreme court held that the great bodily

harm attempted murder instruction "was erroneous \*\*\* in that it told the jury that a person may commit the crime of murder when he has not only the intent to kill, but also when he has certain mental states other than an intent to kill," but that the exception provision of Supreme Court Rule 415(c) was inapplicable because, unlike in the case at bar, "the evidence in this case [*Robert's*] is not 'closely balanced.'" 75 Ill. 2d at 14-15.

We conclude that because in the case at bar (1) there were substantial defects in the instructions; (2) the jury was not properly instructed; (3) the jury was instructed that it could find the defendant guilty of attempted murder simply upon a finding that the defendant only intended to inflict great bodily harm and did not intend to kill the alleged victim; (4) the interests of justice and fundamental fairness require; (5) to correct grave errors; (6) the case is factually close; and (7) the jury should have been correctly instructed, the defendant's conviction and sentence for attempted murder must be reversed and the cause remanded for a new trial.

Defendant next argues that the evidence failed to establish his guilt beyond a reasonable doubt that he attempted to murder Officer Richard Rowan. He adamantly urges that it was he who was shot by Officer Rowan, when, in response to his question to Rowan if he had a search warrant, Rowan angrily responded, "Here's my search warrant," pressed his gun in the defendant's stomach and Rowan's gun went off. Defendant insists that Officer Rowan and the other officers' testimonial version of Rowan's shooting the defendant is a patently obvious concocted and fabricated subterfuge to cover up Rowan's accidental shooting of him.

Undeniably supportive of these contentions, the defendant demands, is the defendant's totally uncontradicted testimony that he was shot only once, and not in a vital area, but rather in his lower abdomen. Neither, the defendant insists, would ever have occurred, and indeed are even unimaginable by the most bizarre fantasy, if the shooting had occurred as related by the officers.

Defendant argues that upon the apartment being suddenly and forceably entered by a dozen police officers, for him to flee up a flight of stairs, followed by the officers with their drawn guns, enter a bedroom, take a crouch stance with a gun in his hand and point it at the head of Officer Rowan, who also had his gun drawn, would not only have been completely idiotic, it would also have been even more completely suicidal. The defendant posits that under the circumstances related by the officers, for Officer Rowan not to have riddled the vital organs of the defendant's body with gunshots demonstrates a truly

unbelievable concern, and indeed an uncomprehensible and a totally unrealistic gracious consideration by Officer Rowan for the defendant's well-being and survival. For Officer Rowan to grab the defendant's gun, as he testified he did, and not shoot the defendant, as he assuredly would have done, the defendant urges, escalates the officers' version of Rowan's shooting of the defendant to a fanciful, ridiculous absurdity. Add to that, the defendant argues, the officers' compulsorily admitted testimony that the gun that they attributed to the defendant, which gun the defendant denied having had, did not even have a bullet in the chambers either under or next to the firing pin and would have required three pulls of the trigger to fire and that the defendant did not pull or attempt to pull the trigger, or for that matter, there was no evidence that the defendant even had his finger on the trigger, elevates the officers' version of the shooting to stark nonsense. The defendant insists that such a conclusion is inescapable even in the absence of Officer Rowan's pertinent testimony that he, significantly, never mentioned in his police report of the shooting that the defendant hit him in his face with the gun, or that the defendant was in a crouched position, or that the defendant grabbed his gun. The defendant finalizes that the officers' testimonial rendition of the incident is too preposterous to be proof beyond a reasonable doubt and that it should not be judicially condoned as a defense to Officer Rowan's unwarranted accidental shooting of him.

The defendant additionally argues that even if the officers' version is fallaciously accepted, their version nevertheless fails to establish beyond a reasonable doubt that the defendant attempted to murder Officer Rowan. He urges that the State's evidence that he pointed a gun at Officer Rowan's head, without any evidence that he had his finger on the trigger or that he attempted to pull the trigger or fire the gun and because the State's evidence established that the defendant could have fired or attempted to fire the gun if he had chosen to do so, and the undisputed State's evidence that the chambers of the gun were empty under and next to the firing pin and required three pulls of the trigger to fire, not only fail to prove beyond a reasonable doubt the defendant's intent to attempt to kill Officer Rowan, but more importantly, the foregoing State's evidence affirmatively established beyond a reasonable doubt that he did not intend to attempt to kill him. The defendant concludes that the mere pointing of the gun at Officer Rowan's head under these aforementioned circumstances certainly did not constitute a substantial step toward an attempt to murder the officer.

To sustain a conviction for attempted murder, the evidence must

prove beyond a reasonable doubt that the defendant had and acted with the specific intent to kill the victim and that he took a substantial step towards the commission of the attempted murder. (*People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.) The defendant's specific intent to kill may be shown by the surrounding circumstances, the character of the assault and the method in which the deadly weapon is used. (*People v. Koshiol* (1970), 45 Ill. 2d 573, 262 N.E.2d 446.) It is the function of the jury to determine the existence of the defendant's requisite intent, and that determination is not to be disturbed on review unless a reasonable doubt of the defendant's guilt clearly appears. Although the defendant's foregoing arguments and contentions are forceful, they are not sufficiently potent to warrant our disturbing the jury's guilty finding. Accordingly, we decline to reverse it.

We, likewise, and for the same reason, refuse to disturb the jury's verdict finding the defendant guilty of possession of controlled substances, cocaine and heroin, with intent to deliver. Although the defendant had no prior criminal record, not even an arrest, and denied that he lived in the premises in which he was arrested and in which the drugs were discovered and seized, and denied possession of the drugs, his possession of the drugs was a question of fact for the jury's determination. The competent and legally admissible evidence, if believed by the jury beyond a reasonable doubt, was adequate to establish proof of the defendant's possession of the drugs and to sustain the jury's guilty finding. We reject the defendant's contrary argument and contention.

The defendant contends that the jury was precluded from making a proper assessment of whether the legally competent evidence established his guilt beyond a reasonable doubt of possession of the drugs because of the improper influences of the other highly inflammable, prejudicial inadmissible evidence and the prosecutor's highly improper argument on the jury in its guilt decision-making process. The defendant persuasively argues that he was denied a fair trial by (1) the prosecutor's opening statement on; (2) the voluminous irrelevant, prejudicial inadmissible evidence of; and (3) the prosecutor's capacious argument on the facts and circumstances of and surrounding the issuance of the search warrant. This argument is indeed meritorious, for which reason reversal of the defendant's conviction of possession of the controlled substances and a new trial are required.

The defendant was charged with and was on trial for his alleged March 8, 1983, unlawful possession of the heroin and cocaine discovered on that date in and seized from a second-floor bedroom of a

townhouse apartment at 1150 West 50th Street, Chicago, Illinois, in execution of a search warrant. The probable cause in the complaint for the search warrant was for, and the search warrant commanded the search of, "Femi [with his description]" and 1150 West 50th Street, not 1110 West 50th Street, the address of the premises at which the officers executed the search warrant and in which Femi Okundaye, the defendant, was arrested and the drugs were discovered and seized.

Although on October 25, 1985, the defendant's attorney filed a written motion to quash the search warrant and to suppress the seized drugs as evidence, the motion did not as a ground therefor assert or rely on the warrant's inaccurate or inadequate description, or failure to particularly describe the premises commanded to be searched. The clerk's half-sheet or memorandum of orders contains an entry of March 20, 1986, "hrg commenced on motion to quash warrant and suppress evidence motions denied." Nevertheless, the complete transcript of the entire trial proceedings of the record on appeal before us does not contain any transcript of any testimony of or reflect that any evidentiary hearing was held on the motion to quash the search warrant and suppress the evidence, or that the trial court ever ruled thereon. It appears from the record that the defendant's attorney did not pursue the motion to quash and suppress after filing it.[1]

For the foregoing reasons, and others, the legality of the search warrant, the search of the premises, the arrest of the defendant and the discovery and seizure of the drugs were not cognizable issues for the jury's determination. Thus, the highly prejudicial and irrelevant evidence of the facts and circumstances surrounding the acquisition or probable cause and the issuance of the search warrant was clearly inadmissible. Yet, the prosecutor indecorously commenced the trial of the case at bar with the following improper opening statement of irrelevant, prejudicial and inadmissible evidence of the facts and circumstances spanning the issuance of the search warrant:

> "Ladies and gentlemen, you will hear the testimony that on May the 7th, 1985, approximately two hours before this incident, approximately 1:15 in the afternoon, police officer Richard Rowan walked right through those courtroom doors,

---

[1]The record before us reflects that an evidentiary hearing was held on August 14 and September 9, 1986, on the defendant's written motion to suppress his statements on *Miranda* grounds, the original of which was filed on September 13, 1985, and an amendment thereto was filed on March 19, 1986. The trial court overruled the motion on September 9, 1986, at the conclusion of the evidentiary hearing thereon.

walked right into this courtroom and appeared before *the Honorable Roger J. Kiley, Jr., that was the judge* who was sitting in this courtroom on May the 7th, 1985.

*Officer Rowan presented to Judge Kiley information that he had secured earlier that day, information from a confidential informer the fact that the defendant was serving heroin from his townhouse located at 1110 West 50th Street.*

*Officer Rowan gave this information to Judge Kiley. Judge Kiley listened and looked at this information. Judge Kiley found that there was probable cause to issue a search warrant. Judge Kiley issued a search warrant to search the defendant Femi Okundaye and his townhouse and Judge Kiley* commanded that all heroin and narcotic paraphernalia found either on the defendant or at that townhouse be confiscated.

Ladies and gentlemen, the evidence will show that after police officer Rowan *received that search warrant from Judge Kiley* he left this courtroom, he left 2650 South California and he went directly to the Organized Crime Division Narcotics Office of the Chicago Police Department located at 22nd and 24th.

Ladies and gentlemen, with this search warrant he went back to his office to organize, attempt to execute that search." (Emphasis added.)

Although defense counsel did not object to the prosecutor's opening statement, its prejudicial impact is quite apparent, which the prosecutor aggravated by eliciting the following irrelevant improper testimony from State witness Chicago police officer James Molloy, on the officers' and the judge's procedure in obtaining and issuing a search warrant:

"Q. What are the functions of the Organized Crime Division?

A. The Organized Crime Division is broken up in three sections, Intelligence, Vice and Narcotics. The Narcotics Section of which I am part is specialized in narcotics investigations, making control buys, executing search warrants and focusing on dealers and we also do investigation to transcend district boundaries and assist department district officers when it is needed.

Q. What is a search warrant?

A. A search warrant is a judicial order that allows the person who has applied for the warrant and had it signed to search a person and premise named in the search.

* * *

Q. How are search warrants obtained, sergeant?

A. There are several ways through surveillance, through going in after a controlled purchase is made or by acting on reliable information.

Q. Once information is obtained what would an officer do to obtain a search warrant?

A. To start with an officer would try to verify as much of the information as he could by on-site investigation. After doing so he would sit down at a typewriter and type out a complaint for search warrant and also the search warrant document itself. After the officer types up this complaint he then *submits it to his unit watch commander for their approval. Once that is done* the complaint and the warrant is taken to the Narcotics Section of the Cook County State's Attorney's *Office and an assistant state's attorney will peruse the document, check it for reasonableness. He will then approve it, affix a* search warrant number to it.

Q. Once the state's attorney approves a search warrant where is it taken afterwards?

A. The officer then takes it to a judge. *The judge will read the warrant, he will swear the officer,* he will ask the officer certain questions about the warrant if he has any. *He will then ask the officer if it is in fact a true and accurate* description of the things set forth in the warrant.

Usually *in the warrant the officer is establishing the fact that there has been a crime committed or has been committed and fruits of the crimes can be found at a place. And then the judge will ask the officer to sign the warrant and then the judge will sign the warrant."* (Emphasis added.)

After State's witness Molloy testimonially led the jury through the irrelevant, prejudicial process surrounding the issuance of a search warrant, the prosecutor had State's witness Officer Rowan repeat the process in more minute detail. Rowan's testimony was as follows:

"Q. Officer, directing your attention to the early morning hours of May 7, 1985, did you have an occasion to have a conversation with someone?

[Defense Attorney]: Object, judge.

THE COURT: Basis?

[Defense Attorney]: The early morning hours of May 7th, judge, is [sic] not relevant. Relevancy.

THE COURT: I will allow it, go ahead.

[Prosecutor]: Thank you, your Honor.

Q. You may answer the question, officer[.]

A. Yes, I did.

Q. And officer were you with your partner at the time you had that conversation?

A. Yes, I was.

Q. And that was Officer Ramirez?

A. Yes, it was.

Q. Officer, who did you have a conversation with?

[Defense Attorney]: Objection, judge.

THE COURT: Counsel, approach the bench.

(Discussion out of the hearing of the jury:)

THE COURT: I thought this was just some quick orientation now you are going into something—.

[Prosecutor]: I am not, I am only asking him based on this conversation with the CI what did he do pursuant to that conversation.

THE COURT: You are going to the obtaining of the warrant, is that it?

[Prosecutor]: Yes.

THE COURT: So, all you have to say you spoke to someone.

[Prosecutor]: Confidential informant, and pursuant to that conversation what did he do?

THE COURT: I can't see any problem with that.

[Prosecutor]: I am not going to conversation.

(Back before the jury:)

THE COURT: Continue.

[Prosecutor]: Thank you, your Honor.

Q. Officer, you may answer that question[.]

A. Confidential informant.

Q. Officer, after you had that conversation with the confidential informant did you go someplace?

A. Yes, I did.

Q. Did you go there alone or with somebody?

A. I went there with my partner, Officer Armando Ramirez and the confidential informant.

Q. Where did you go?

A. 1110 West 50th.

Q. What is located at 1110 West 50th?

A. A large complex of town houses all with the same address that are designated by individual letters going from A, B, C and to double A double B double C, through the alphabet.

Q. Officer, did you, your partner and the confidential informant go to a particular townhouse?

[Defense Attorney]: Objection, judge."

Out of the hearing of the jury, the prosecutor candidly admitted that "the argument going to whether or not they [the police officers] had a legal warrant is inappropriate to the jury. Now, with regard to what led up to the execution of the warrant, it is really not relevant ***. *** [H]is checking it out to get more probable cause is really immaterial in the case." After making the foregoing legally accurate acknowledgements, the prosecutor nevertheless promptly proceeded to further ignore them by thereafter eliciting in the jury's presence the following additional irrelevant, prejudicial inadmissible testimony from Officer Rowan of the facts encompassing the issuance of the search warrant, to which the defendant's objection was overruled:

"Q. Officer, [you] may answer that question[.]

A. Right. If I recall the question, it was who I went to the location with.

Q. Who did you go to the location with?

A. I went with myself, my partner, Officer Ramirez, and the confidential informant.

Q. Did you go to the particular townhouse located at 1110 West 50th Street?

A. We didn't walk up to the townhouse in question, we drove by it and it was pointed out to me.

Q. Which townhouse was pointed out?

A. I, double I.

Q. Officer, did you then leave that location?

A. Yes.

Q. Officer, after you left that location what is the next thing you did?

A. Earlier or later that morning I went to 2201 West 24th Street, narcotics headquarters and prepared a search warrant for the location in question and the individual described to me by the confidential informant.

Q. Officer, in the search warrant did you include the description of the individual described by the confidential informant?

A. Yes, I did.

Q. Did you also include the address?

A. I included the address of 1150 West 50th Street and a male black known as Femi, approximately 5 foot 11 inches, 155 pounds, dark complexioned.

Q. Officer, you included the address of 1150 West 50th

Street. Was that the address you had gone to?

A. Yes, it was the address myself and the informant and my partner and again with my partner again.

Q. Officer, when you typed 1150 West 50th street, was that the correct address?

A. No, it is not.

Q. What was the correct address?

A. 1110 West 50th, apartment—.

Q. Officer, why did you type a 5 instead of a 1?

A. Just a typo on my part, it was an accident.

Q. Does the address of 1150 West 50th Street exist?

A. No, there is no such address at all, it is a complex all with all the common address of 1110 West 50th and broken down by letters.

Q. Officer, are there any other town houses with the letters II?

A. No, that is the only double I townhouse in the complex.

Q. Officer, after you finished typing that search warrant and the complaint for the search warrant what did you do with those two pieces of document?

A. I presented it to my sergeant, Sergeant Malloy [sic].

Q. Did you see him do something with it?

A. He read through it, asked me about the complex and then initialed the documents.

Q. After he did that, officer, what did you do?

A. I came to 26th and California, went up to the narcotics section and presented the complaint for search warrant and the search warrant itself to State's Attorney Levy in the narcotics section.

Q. Officer, what did you see Assistant State's Attorney Levy do with the search warrant and the complaint for the search warrant?

A. He read through it, asked me some questions about the location and then he assigned a search warrant control number to it and his signature and the date that he signed it.

Q. Officer, after Assistant State's Attorney Levy affixed his signature what is the next thing you did with the search warrant and the complaint for search warrant?

A. I presented it to Judge Kiley in this building, in this courtroom, as a matter of fact, and he read through it and he in turn signed it and put the day and date and the time that he signed it.

Q. Before he signed it, did you do something to it?

A. Yes, Judge Kiley swore me in and I signed the search warrant in front of him.

Q. Officer, after Judge Kiley signed that search warrant, had issued that search warrant, what did you do with it?

A. I went back to narcotics headquarters at 2201 West 24th Street, notified the sergeant of the fact that we had secured the search warrant to the premises and the defendant and we proceeded to do a draft of the complex in question and assign responsibilities of the team members."

The State's argument before us that the foregoing voluminous, highly prejudicial, irrelevant, inadmissible testimony was designed to establish, over and above Officer Rowan's testimony, that the 1150 West 50th Street address on the search warrant was a typographical error is ludicrous. First, Officer Rowan testified that the 1150 address was a mistake. Second, the legality of the warrant or its execution was not an issue for the jury's determination, as the prosecutor had earlier confessed. Third, the address on the warrant was further irrelevant for the reason that the defendant was arrested in the premises, whatever was the address on the warrant or of the apartment, in which the narcotics were seized, and in which the telephone services were billed to the defendant.

In the present case, the prosecutor brought out the prejudicially erroneous testimony of Officers Molloy and Rowan, not only that they had discussed the information about the defendant with the State's Attorney, but that they additionally obtained his approval and also that of the judge who issued the warrant for the defendant's arrest. This court recognized that reversible prejudicial error occurs when a prosecutor testifies that after speaking to the police, he recommended that charges be brought against the defendant, and this foregoing complained-of testimony runs directly afoul of our following holding in *People v. Turner* (1984), 127 Ill. App. 3d 784, 792, 469 N.E.2d 368:

"The fourth issue raised is whether the introduction of the testimony of an assistant State's Attorney recommending that charges be brought against the defendant was error. The State argues that Michael Ditore's testimony simply outlined the steps taken leading to the recommendation of charges. We find no merit in this contention. A prosecutor's testimony that he recommended that charges be placed against a defendant after discussing the facts of the case with the police was held prejudicial error requiring a new trial in *People v. Blissit* (1973), 12 Ill. App. 3d 551, 299 N.E.2d 562. The prejudicial impact of Di-

tore's testimony is greater in the instant case because he testified not only that he spoke with police prior to recommending charges, but also with several witnesses and the defendant. *** The prejudicial effect of this testimony requires that the case be remanded for a new trial."

People v. Hunter (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659, relied on and cited in the specially concurring opinion, is not authority for the admission in the case at bar of the foregoing voluminous, highly prejudicial, and inflammatory "testimony of police officers concerning their [prearrest] investigatory techniques" as stated in the specially concurring opinion. (189 Ill. App. 3d at 624.) First, the defendant's trial on the issue of his guilt or innocence of the offenses of unlawful possession of narcotic drugs and attempted murder (or for any other offense for that matter) did not authorize the prosecutor's presentation of the totally irrelevant and immaterial, but highly incriminating and prejudicial, evidence of the police officers' investigatory tactics and conduct. Educating the jurors on police investigatory techniques was not a legitimate function or an issue in the defendant's criminal trial, however thrilling and enchanting such techniques may be to them. At trial, the defendant was required to defend against only what he did, as alleged in the charges against him. He was not required to simultaneously defend against what the police did in their investigation.

Second, in the instant case, the defendant was arrested pursuant to and in execution of a search warrant which commanded the search of "Femi [with his description]" and 1150 West 50th Street, the premises in which the drugs were seized and the defendant was arrested. In Hunter, however, the officers arrested the defendant without a warrant. A month after a conversation with an informant regarding the defendant and his car, the arresting officers in Hunter began a surveillance of the defendant and his car and observed an individual approach the car and exchange something with the defendant. The officers followed the defendant to another location where the officers observed three to five people, known to the officers to be illicit drug users and addicts, approach the defendant's parked car and exchange something with him. Suddenly, one of the addicts recognized the surveilling police officers and the group around the defendant's car scattered and ran. The defendant attempted to pull away but obeyed the officers' signal for him to stop. When the defendant opened the car door, the officers observed 10 to 14 pills, which were an illicit drug, scattered on the front seat and floor of defendant's car.

Even if there existed some justifiable basis for explaining to the

jury the officers' prearrest conduct and warrantless arrest of the defendant in *Hunter*, no such justification remotely existed for explaining the officers' presearch and arrest conduct in the execution of a search warrant and the arrest of the defendant in the instant case.

Second, there was no pretrial motion to suppress the narcotics, nor was there an *in limine* motion to exclude the officers' prearrest conduct in the instant case. In *Hunter*, defendant made both these motions. At a pretrial hearing in *Hunter* regarding probable cause to arrest defendant and search his car, one of the surveilling-arresting officers testified that approximately one month before the defendant's arrest, an informant told him that the defendant, whom the informant identified as "Speedy," was selling drugs in the area, having taken over the usual route of a deceased member of the El Rukin gang. The informant also provided the officers a description of the defendant's car, including the license plate number. The trial court ruled that the substance of this conversation could not be revealed at trial, but that the officers could testify that a conversation between the informant and the officers took place. Pursuant to this *in limine* ruling, the surveilling-arresting officers testified, over the defendant's objection, that they placed the defendant under surveillance based on a conversation with an informant concerning the defendant and his car, which the defendant assigned as error on the appeal of his conviction for the unlawful possession of the drug pills found in his car.

The *Hunter* court aptly pointed out that "[t]he trial court took care to avoid undue prejudice to defendant by assuring that the damaging substance of the conversation [between the officers and the informant] would not be heard by the jury," and that the officers' testimony that they merely had a conversation with an informant was not inadmissible hearsay. 124 Ill. App. 3d at 529.

In *Hunter*, as in the case at bar, the prosecutor in closing argument to the jury improperly treated the officers' testimony of their prearrest investigative procedures as evidence of the defendant's guilt of the commission of the offense for which the defendant was on trial. The *Hunter* court noted that in arguing to the jury the evidence from which the jury could infer the defendant's intent to deliver the drugs, one factor mentioned by the prosecutor was "the prior conversation of the officer with the informant." The *Hunter* court concluded, "We agree that this was improper use of the evidence," and cautioned:

> "With regard to the impropriety of the prosecutor's argument concerning that testimony, *it should be noted that prosecutors have recently begun to take improper advantage of the admissibility of such evidence* by ostensibly offering it for the

limited purpose [of explaining the officer's investigatory procedure], and once it is admitted, *making impermissible use thereof in closing argument* [citation], *and we would warn that this conduct is improper* and, in flagrant cases, may lead to reversal [citation]. If the State indeed intends to use it for the limited purpose permitted, the prosecutor should confine his arguments to that purpose, and *any improper use should not be tolerated.*" (Emphasis added.) 124 Ill. App. 3d at 530-31.

The foregoing *Hunter* warnings and admonitions were flagrantly unheeded and violated by the prosecutor in the case at bar. In opening and closing argument to the jury, the prosecutor relied on the officers' foregoing improper and prejudicial testimony of the circumstances of the issuance of the search warrant in urging the jury to convict the defendant on the totally improper and irrelevant grounds that the officers not only confirmed defendant's pretrial guilt to their satisfaction but also to the satisfaction of the assistant State's Attorney who supervised and approved, and Judge Kiley, who ordered the issuance of, the warrant to search the defendant and the premises. The prosecutor in his closing argument improperly stated in effect not once, but at least 10 times, that the assistant State's Attorney and Judge Kiley clearly believed that the officers had adequate evidence of the defendant's guilt. The prosecutor unfittingly argued:

"You heard the testimony of Sergeant Molloy of the Organized Crime Division, who explained to you what a search warrant is and he described to you a little bit about what the Organized Crime Division, Narcotics Unit of the Chicago Police Department is.

\* \* \*

He [the defendant] wants you to believe that there is a conspiracy, that the Chicago Police Department is out to get him. They're out to frame him. *He wants you to believe, too, that that conspiracy includes the state's attorney's office, and the judicial system, Judge Kiley.*

[Defense Attorney]: Objection, judge.

THE COURT: Objection sustained.

[Prosecutor]: *He wants you to believe that we're all involved in the conspiracy.*

\* \* \*

You've heard how methodical the process is. You've heard all the procedures that have to be followed. When a police officer secures information from a confidential informant he must verify it.

Officer Rowan and Officer Ramirez went directly to Town House II with the confidential information located at 1110 West 50th Street, pointed out exactly where the defendant lived, found out the defendant's name, Femi, found out that the defendant was five feet eleven, found out that he was a male black, that he weighed 155 pounds.

Officer Rowan then took that information, went back to his office and typed up a complaint for a search warrant and a search warrant. He then took that information and brought it here to 26th and California. He went up to the Narcotics Unit of the state's attorney's office. He gave that information to Assistant State's Attorney Levy.

Mr. Levy looked at that information. After looking at the information *Officer Rowan then took that same information right here to this very courtroom. Judge Kiley was sitting on that bench.*

*Officer Rowan gave Judge Kiley that search warrant* and that copy of search warrant. Inside, that complaint for search warrant contained all the information that Officer Rowan had gotten from the confidential informant.

*Judge Kiley looked at that information.* He read that information. *He thought about that information. He ruled on that information, and he issued a search warrant.*

[Defense Attorney]: Objection.

THE COURT: Objection sustained. Counsel, please argue material matters as they relate to this case.

[Prosecutor]: *Judge Kiley issued that search warrant. Officer Rowan left this courtroom with the search warrant Judge Kiley had just issued* and went back to the Narcotics Unit of the Chicago Police Department. There he gave that information to Sergeant Molloy. There began the Organization of the team who was going to execute that search warrant.

\* \* \*

We have a Chicago police officer who is a Chicago police officer. He's not a typist. He went to 1110 West 50th Street, Town House II with that informant. He checked it out. He secured all the necessary information. He went to his office. He typed up that search warrant and complaint for search warrant, including all that information. He brought it here. *Judge Kiley issued the search warrant.* He brought it back to his office. The team went out, went directly back to Townhouse II, 1110 West 50th Street. Ladies and gentlemen, *typos happen. It*

*doesn't affect the validity of the search warrant.*
\* \* \*

Ladies and gentlemen, you heard Police Officer Rowan testify. His testimony was clear, consistent and credible. He is to be believed by each and every one of you. He told you what happened on May 7, 1985. He told you how he met with that confidential informant, the necessary steps he took, how he went to 1110 West 50th Street, Townhouse II, with that confidential informant, how he took that information he received from that confidential informant, including a physical description of the defendant, placed it all into a search warrant, and here at 26th and California talked with the assistant state's attorney, showed him the information, came into this courtroom, *showed the same information to Judge Kiley* and *Judge Kiley issued the search warrant."* (Emphasis added.)

This foregoing argument flagrantly violates our following holding in *People v. Turner* (1984), 127 Ill. App. 3d 784, 792-93, 469 N.E.2d 368:

"Defendant's fifth and last contention is that statements made by the prosecutor during closing argument were prejudicially improper. \*\*\* During closing argument, the prosecutor stated, 'The fact Mr. Ditore told you that Malcolm Turner was [not] charged with the murder or anything until April 18th I think has significance. \*\*\* I think it showed we don't just charge people lightly with crimes. We have to get in the case of a homicide a cause of death from the medical examiner's office. And we are not going to charge people with crimes, like the crime of murder, until we have that evidence. \*\*\*'

A prosecutor's statements implying that charges would not have been placed against the defendant unless the prosecutor thought he was guilty are improper and prejudicial error. (*People v. Fuerback* (1966), 66 Ill. App. 2d 452, 456, 214 N.E.2d 330.) In light of the fact that it was highly prejudicial for Ditore to testify regarding the placing of charges against the defendant after discussing the case with police, witnesses, the defendant, and the medical examiner, the prejudice to the defendant was further compounded by the prosecutor's reference to this testimony in closing argument. We are of the opinion that the outcome may have been otherwise had the State omitted these remarks and their inclusion constituted reversible error."

In the foregoing prosecutor's closing argument to the jury in the

case at bar, far worse than the prosecutor's improper argument in *Turner*, the prosecutor repeatedly improperly and emphatically inferred that the police officers, the assistant State's Attorney and Judge Kiley prejudged the defendant's guilt of the possession of drugs by the issuance of the search warrant, and that the defendant was therefore guilty of the possession of drugs as charged. The defendant's conviction of the possession of the drugs must therefore be reversed and the cause remanded for a new trial free of such egregious errors.

Reversed and remanded for a new trial.

PRESIDING JUSTICE MURRAY and JUSTICE COCCIA, specially concurring:

We agree with the majority that this cause must be reversed and remanded, but we would limit the reason to the improper use in closing argument of otherwise admissible evidence. The testimony of police officers concerning their investigatory techniques is properly admitted into evidence despite its hearsay nature and despite the fact that a jury may gather an erroneous inference from such evidence. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659.) This court has recently noted that prosecutors have begun to take advantage of the admissibility of such evidence by ostensibly offering it for its limited purpose and, once admitted, making an impermissible use of it in closing argument. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659.) As the majority opinion aptly points out, in this case the evidence was used not for its legitimate purpose of showing investigative technique, but to infer guilt. We are of the opinion that this is the type of flagrant use of such evidence which this court warned could lead to reversal in *People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659, and other cases. The war on drugs may not be successful by following the Marquis of Queensberry Rules. Yet individual cases may be reversed and remanded for the failure to follow well-established rules of evidence.