In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-1515, 05-1632 & 05-1633

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HERMAN CUNNINGHAM, LARRY D.
WILLIAMS, SR., a/k/a "L," and
DAVID HARDIN, a/k/a BIG DAVE,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 03 CR 191—**Sarah Evans Barker**, *Judge.*

ARGUED JUNE 6, 2006—DECIDED AUGUST 29, 2006

Before FLAUM, *Chief Judge*, and POSNER and KANNE,
*Circuit Judges.*

KANNE, *Circuit Judge.*    After a jury trial, Herman
Cunningham, Larry Williams, and David Hardin were
convicted of conspiracy to commit various drug offenses
involving the distribution of heroin in Indianapolis, Indi-
ana. *See* 21 U.S.C. §§ 841(a)(1), 846, 860(a), 861(f). Hardin
was also convicted of possession with intent to distribute

heroin and of being a felon in possession of a firearm.[1] *See* 21 U.S.C. § 841(a)(1); 18 U.S.C. § 922(g)(1). Cunningham was sentenced to life in prison; Williams and Hardin were sentenced to 420 and 300 months' imprisonment, respectively. Over the defendants' objection at trial, the government recounted a litany of procedures of the local U.S. Attorney's office, the Office of the Attorney General, and the Drug Enforcement Administration ("DEA") utilized in seeking court authorization for two telephone wiretaps. In doing so, the government witness's testimony suggested to the jury that a panel of senior government lawyers in the Office of the Attorney General in Washington, D.C. and others in law enforcement were of the opinion that there was probable cause to believe the defendants were indeed engaging in criminal activity. The admission of this irrelevant evidence had the effect of improperly bolstering the credibility of the government's case in the eyes of the jury, and the error was not harmless. Accordingly, we reverse and remand.

## I. HISTORY

On August 18, 2004, the government charged 17 defendants in a second superceding indictment with conspiracy to possess with intent to distribute heroin as well as conspiracy to distribute it. The indictment contained 15 counts, and also included a separate section entitled "Sentencing Allegations" aimed specifically at several of the defendants.

This case began when Thomas Verhovshek, a doctoral student at Indiana University-Bloomington, was arrested for possessing heroin in June 2003. He agreed to cooperate

---

[1]  Hardin was acquitted of possessing a firearm in furtherance of a drug-trafficking crime. *See* 18 U.S.C. § 924(c)(1).

with the DEA, and he later conducted several controlled purchases of heroin from Sharon Grundy, his source in Indianapolis. As the evidence at trial indicated, Grundy's supplier was defendant David Hardin. Upon learning this, the DEA and the U.S. Attorney's Office for the Southern District of Indiana sought and received court authorization for a wiretap on Hardin's cellular telephone, pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 2510 *et seq.* ("Title III").

From the wiretap, the DEA learned that Hardin's supplier was defendant Larry Williams. The DEA and the local U.S. Attorney then sought and received court authorization for a wiretap on Williams's telephone, again pursuant to Title III. After further investigation, the DEA determined that Williams's supplier was defendant Herman Cunningham in Chicago.[2]

At trial, the government sought to introduce the recordings of the intercepted telephone calls though the testimony of DEA Special Agent Gerald Dooley. The government elicited from Dooley the application process followed by certain government agencies prior to seeking court authorization. Because of the importance of Dooley's testimony to this appeal, we recount the relevant portions of it here (hereinafter, the "Title III evidence"):

> Q: After the use of all of these techniques, did you reach a conclusion as to an investigative techniques which you thought should be employed?
>
> A: Yes, we did.
>
> Q: And what was technique?

---

[2] Although for simplicity's sake we refer to Williams as Hardin's supplier and Cunningham as Williams's supplier, the government introduced evidence that their respective relationships were more than that of buyer and seller.

A:  A title 3 electronic surveillance, or what's commonly known as a wire tap.

Q:  Now was the next thing you did basically was push a button and start listening to phone calls?

A:  No, sir, it was not.

Q:  What steps, if any, did you take to get authority to wire tap a telephone in this case?

A:  In order to initiate an electronic surveillance, or a wire tap, there are many levels of approval that have to be gained in order to initiate an electronic surveillance or wire tap. Starts by the agent's writing a very extensive affidavit outlining all the probable cause as to the particular device or cell phone that you wish to monitor or wire tap.

Q:  In that affidavit did you detail all the evidence regarding the controlled buys?

A:  Yes, we did.

Q:  And did you detail all the other law enforcement techniques which you had attempted?

A:  Yes.

Q:  And is it your understanding that you're required to at least consider, or attempt all those other law enforcement techniques prior to applying for a wire tap?

A:  Yes.

Q:  And did you prepare such an affidavit?

A:  Yes, I did.

Q:  And was it provided to the United States Attorney's Office here?

A:  Yes, it was.

Q:  Are you familiar with where the affidavit goes from the United States Attorney's Office here?

A:  Generally, yes, I am.

Q:  Where does it go?

A:  Once the United States Attorney's Office here has reviewed the affidavit and approved it at their level, it is then sent by the United States Attorney's office here in the Southern District of Indiana to the Attorney General's office in Washington D.C. where it is my understanding there are essentially a panel of attorneys that work for the Attorney General's Office who again serve as another level of review—

[HARDIN'S ATTORNEY]:  Objection. This is hearsay and also brings in an opinion from somebody outside the court, namely the attorney's office.

THE COURT:  Overruled. He is testifying to the process as he understands it. You can cross-examine.

A:  As I was saying, the Attorney General's Office in Washington D.C. then reviews and approves the affidavit and all the probable cause within the affidavit. Once they have approved it, it is sent back to the U.S. Attorney's Office here. Once it is received here at the U.S. Attorney's Office, a United States District Court Judge then reads–

Q:  Well, let me stop you there. Is there a similar approval system that you have to go through with your agency, the Drug Enforcement Administration?

A:  Yes, there is.

Q:  And what is that process?

A: Essentially when an affidavit is completed by our office a section of the affidavit deals with prior applications for the particular device that you are attempting to gain permission to do the wire tap. We have to send through our DEA channels to our higher headquarters in Washington D.C. to ensure that there have been no other applications made for that particular device or for the individuals associated in the affidavit or named in the affidavit as interceptees. Then we receive the approval from our DEA in our headquarters that that affidavit as far as DEA is concerned there's not a duplicitive effort, there's not some other agency or some other part of DEA that's trying to do the same investigation.

Q: Did there come a time when you asked the United States District Court in this district to approve your request for a wire tap?

A: Yes.

Q: And did you ask the district court in an application to supervise that wire tap?

A: Yes.

Q: How does the district court to your understanding supervise–or how did the district court supervise your wire tap?

A: Essentially once the District Court Judge approves and signs the affidavit, the affidavit is then sent to the cellular service provider. The cellular service provider then begins transmitting the content of all the calls to us at the federal building, wherever the intercept is set up.

The District Court Judge every ten days reviews the number of calls that have been intercepted, the number of calls that have been flagged as pertinent or drug related, the number of calls that have been

flagged as nonpertinent or nondrug related as well as the number of calls that have been minimized by the persons that are monitoring the wire tap.

The government later elicited testimony regarding the second wiretap:

Q: Did you receive authorization from the district court to intercept telephone calls occurring over the telephone using telephone number [XXX-XXX-XXXX]?

A: Yes, we did.

Q: And you detailed a number of steps you took—I'm not going to have you repeat those. Did you take those same steps with regard to this phone?

A: Yes, we did.

The defendants appeal the admission of this testimony relating to procedures used to obtain the Title III authorizations.[3]

## II. ANALYSIS

The defendants objected to the admission of the testimony regarding the application process that was followed in garnering the district court's Title III wiretap authorizations. The district court's evidentiary decisions are reviewed for an abuse of discretion. *United States v. Owens*, 424 F.3d

---

[3] The defendants also appeal the inclusion of the Sentencing Allegations in the indictment and Williams appeals the denial of his request to represent himself as well. Because of our disposition of this case, we do not reach either the denial of the defendants' motion to strike the Sentencing Allegations or the denial of Williams's request to proceed pro se.

649, 653 (7th Cir. 2005); *United States v. Souffront*, 338 F.3d 809, 825 (7th Cir. 2003).

We note that Hardin's attorney, and thus all three defendants, timely objected.[4] The attorney stated, "Objection. This is hearsay and also brings in an opinion from somebody outside the court, namely the attorney's office." The judge responded, "Overruled. He is testifying to the process as he understands it. You can cross-examine." We understand from the wording ("This . . . brings in an opinion from somebody outside the court, namely the attorney's office.") and the timing of the objection that it was based not only on hearsay, but also on relevance. The government does not dispute that the objection was based on both of these grounds.

It is apparent that the Title III evidence was not relevant in this case. Moreover, Judge Barker's ruling addressed only the hearsay objection–not the relevancy objection. The procedures used and the opinions obtained in gaining authority for use of the wiretaps were wholly unrelated to the defendants' guilt or innocence–and not necessary to be established to prove the case against the defendants. *See* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."), 402 ("Evidence which is not relevant is not admissible.").

The obvious purpose of the evidence was to show the jury there were several senior government attorneys and agents who all believed there was probable cause that the defen-

---

[4] Pursuant to an agreement between the attorneys and the court, an objection by one defense attorney would be deemed attributed to all three defense attorneys, unless an attorney specifically opted-out of the objection. When Hardin's attorney objected, the other two defense attorneys did not opt out.

dants were involved in a drug conspiracy, and, indirectly, that they all believed, in their professional judgment, the defendants were in fact committing drug-related crimes.

As the defendants see things, and we agree, the jury was infected by the opinions of these unnamed government attorneys and agents. The government witness was improperly vouching for how good the evidence was.[5] Furthermore, the various procedures (i.e., safeguards) that were detailed served only to bolster the credibility of the unnamed attorneys' and agents' respective determinations.

Without a limiting instruction, the jury was free to consider this evidence in making its determination regarding the defendants' guilt or innocence. In short, the government piled on needless, unfairly prejudicial evidence that may have affected the jury's judgment, and this error was not harmless. *See United States v. Brown*, 692 F.2d 345, 350 (5th Cir. 1982) (finding it was "clearly error" for the district court to admit the wiretap authorization into evidence as foundation evidence and explaining that "the content of the order was neither relevant nor probative to the jury's task of evaluating the actual wire-tap conversations");[6] *cf. People v. Okundaye*, 545 N.E.2d 505, 513 (Ill. App. Ct. 1989) (reversing criminal conviction because "the highly prejudicial and irrelevant evidence of the facts and circumstances surrounding the acquisition of probable cause and the issuance of the search warrant was clearly inadmissible").

The government advances several short (and cursory) arguments to contend that the Title III evidence was relevant. We will address each one in turn.

---

[5] The government conceded at oral argument that this is "certainly one inference that could be drawn."

[6] Although the court in *Brown* found the error to be harmless, we are confronted with more evidence than just the court's authorization. Dooley's testimony inflicted damage that was more substantial than that in *Brown*.

First, the government argues "the process became relevant foundation for the admission of the conversations." The only legal support the government offers is a citation to 18 U.S.C. § 2515, which is a codified exclusionary rule that sets a legal standard for the judge—not a jury—to evaluate. *See* Fed. R. Evid. 104(a).

The government did not cite to any cases in support of its position–because the government's position is not the law in this circuit. In admitting tape recordings, "[t]he Government must prove, by clear and convincing evidence, that the proffered tape is a true, accurate and authentic recording of the conversation between the parties." *United States v. Westmoreland*, 312 F.3d 302, 311 (7th Cir. 2002) (citing *Smith v. Chicago*, 242 F.3d 737, 741 (7th Cir. 2001)). "[T]he Government may meet this burden by establishing the tape's chain of custody or by establishing otherwise a foundation as to the trustworthiness and accuracy of the evidence." *Id.*

There is no authority indicating that the *legality* in obtaining the recording falls within the rubric of "true, accurate and authentic." In other words, the government does not have to prove that the electronic recording of the conversation was properly authorized by a judge to establish the recording was "true, accurate and authentic."

Nor does § 2515 support the government's argument. For our purposes here, § 2515 states that an intercepted wire communication may not be received in evidence if its disclosure would violate Title III. This statute does not require the government to prove it obtained the evidence lawfully prior to seeking its admission (unless, of course, a defendant objects on that ground). In this case, the defendants' objection to the foundation information describing how the wiretap intercepts were authorized was based on hearsay and relevancy grounds, *not* on the legality of the wire intercepts; therefore, § 2515 is inapplicable in this context.

Second, the government argues, "[T]he legality of a warrant is always relevant," citing *United States v. Buchanan*, 529 F.2d 1148, 1151 (7th Cir. 1975). Although this argument is only one sentence long and is undeveloped, it touches on a case dealing with the matter at issue here. In *Buchanan*, the government elicited from its witness the fact that two search warrants had been obtained prior to the search of the defendant's post office box and home. On appeal, the defendant argued the admission of the search warrant testimony was irrelevant because the warrants were not in controversy, and we stated, "The legality of the search is always relevant." *Id.* But we do not read *Buchanan* so broadly as to allow the inclusion of the Title III evidence in this case. It is one thing for a government witness, when telling his story to the jury, to say a search warrant had been obtained, and then the search was made. Although arguably not technically relevant, the information is simply part of the witness's story. It is quite another thing for a government witness to indicate not only that court authorization for the wiretap had been obtained, but to go on about how various other law enforcement personnel believed there was probable cause to obtain the authorization, and to describe the procedures followed in seeking the authorization. Furthermore, in *Buchanan*, we stated the warrant evidence "was not prejudicial to the defendant's case," *id.*, easily distinguishing *Buchanan* from this case.

Also, in *Buchanan*, we did not say what issue the testimony was relevant to. Here, the Title III evidence was only relevant to demonstrate that there were several government officials who believed there was probable cause to obtain the authorization. This is clearly an issue that should be left for resolution of a motion to suppress determining whether § 2515 was adhered to. In this case, the judge did address the wiretap evidence when she ruled on Hardin's motion to suppress prior to trial; the issue was then moot at trial, and therefore irrelevant.

The government's third argument is as follows: "[W]ithout the testimony from Special Agent Dooley regarding the application process, the jury would have been left to speculate as to the legality of the wiretaps." Why would they be speculating at all regarding the legality of the wiretaps? It is not within the purview of the jury to be deciding questions of law, particularly ones involving wiretap authorizations. This type of issue must be resolved by the judge, not the jury.

In countless cases, including this one, such an issue is dealt with by the district judge when ruling on a motion to suppress, typically argued prior to trial and always outside the presence of the jury. Such a procedure was followed here, and Hardin's motion to suppress was denied. The government points to nothing whatsoever in the record to suggest why the jury would be speculating about this issue.[7] There is no mention of any witness testimony or any argument by a defense attorney made prior to Dooley's testimony that would necessitate the government to clarify the legality of the authorization by describing, in detail, the procedures followed by the local U.S. Attorney's office, the Office of the Attorney General, and the DEA. The bottom line is the defense attorneys did not object to the admission of the recordings on the ground that they were illegally obtained. And why would they, given that the motion to suppress had been denied prior to trial? In such a situation,

---

[7] It may be, that given the heightened media attention in recent years regarding the legality of government wiretaps–much of it negative—the government was motivated to show the jury that this wiretap evidence was lawfully obtained. At oral argument, the government was asked whether "[t]here was argument that the tapes were somehow improperly obtained?" The government responded, "No, there was no argument to that nature. None whatsoever." Later, the government tellingly stated, "There was no specific criticism of the government getting a wiretap in this case."

the government had no business introducing the Title III evidence, given no instigation by the defense.

A few pages later in its brief, the government makes its last argument that, at first blush, gives the impression that it was Hardin's attorney who first introduced the Title III evidence. For example, the government argues, "As the evidence with respect to out of court probable cause opinions *was elicited by Hardin's lawyer* to demonstrate Dooley's alleged bias . . . ." (Emphasis added). But the argument is inapposite: In support of its argument, the government cites (only) to portions of Dooley's testimony that was given *a full 15 days after* the government introduced the Title III evidence. Therefore, it is clear Hardin's attorney wasn't eliciting the "out of court probable cause opinion"; they had been elicited 15 days earlier by the government.

Taking a closer look at the government's carefully crafted argument, it appears that the government was attempting an estoppel argument (again, without any legal support or citations). The government was arguing the defendants could not complain on appeal about the admission of the Title III evidence since Hardin's attorney used that evidence during cross-examination to demonstrate Dooley's bias. The argument is of no merit. The damage from the Title III evidence had already been done; Hardin's attorney was only making the best of an already bad situation. In fact, Hardin's attorney was only following Judge Barker's advice, when she stated, "You can cross-examine" in response to the defendants' original objection 15 days earlier.

### III. CONCLUSION

The government has not advanced a valid reason for the admission of the testimony relating to the procedures used to obtain the Title III authorizations. This evidence inappropriately strengthened the government's case and was

unfairly prejudicial to the defendants. Therefore, the defendants are entitled to a new trial free of this error. The defendants' convictions are REVERSED, and the case is REMANDED for a new trial.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*