# United States Court of Appeals

## For the First Circuit

No. 10-1913

UNITED STATES OF AMERICA,

Appellee,

v.

CIRO LOPEZ GARCIA

Defendant, Appellant.

No. 10-1914

UNITED STATES OF AMERICA,

Appellee,

v.

MARCO GARCIA,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul Barbadoro, U.S. District Judge]

Before

Selya, Circuit Judge,
Souter, Associate Justice,[*]
and Lipez, Circuit Judge.

---

[*]    The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Roberto J. Yzaguirre, with whom Yzaguirre & Chapa, was on brief, for appellant Ciro Lopez Garcia.

Joseph M. Wrobleski, Jr. for appellant Marco Garcia.

Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief, for appellee.

February 24, 2012

**SOUTER, Associate Justice.** The defendant-appellants, Ciro Lopez Garcia ("Lopez") and Marco Garcia ("Garcia") were convicted of conspiracy to distribute cocaine, and to possess it with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846. Lopez claims that the evidence was insufficient to prove him a conspirator, and in the alternative he challenges the sentencing judge's finding of the amount of the drug attributable to him. Garcia raises plain error in admitting evidence of law enforcement officers' precautions in executing a search warrant, and in the trial court's failure to declare a mistrial *sua sponte* in response to prosecution testimony referring to a threat of violence by one of Garcia's co-conspirators and to the Mexican origin of the drugs. We see no reversible error and affirm.

Lopez's cousin, Juan Garcia Hernandez ("Hernandez"), was a New Hampshire cocaine dealer, who in 2007 formed a partnership with another dealer in the state, Renaury Ramirez Garcia ("Ramirez"). See United States v. Garcia-Hernandez, 659 F.3d 108 (1st Cir. 2011). In the Fall of that year, the two sought a new source of drugs in Texas, where they met with defendant Lopez, who introduced them to a man known as "Molina." Molina later sent them several large shipments of cocaine, which Hernandez and Ramirez in turn sold to other dealers in New Hampshire, New York, and Massachusetts. Much of the drugs and the proceeds from the sales

-3-

were stored in Hernandez's girlfriend's house on Brown Avenue, in Manchester, New Hampshire.

The partners were imprudent, however, and after too many sales of cocaine on credit they eventually owed Molina several hundred thousand dollars, a debt that led Ramirez to seek another source of cocaine that he could sell to pay off the debt. He found one right in New Hampshire and made a deal to buy ten kilograms of cocaine for $230,000. The source, however, was a government informant, and when Ramirez traveled to Manchester to get the drugs in March 2009, an undercover agent arrested him.

As a consequence, Ramirez's girlfriend, Nicole Kalantzis, decided to cooperate with the government in order to obtain leniency for her boyfriend. In her new capacity, she met with Hernandez, who told her that a large shipment of cocaine would soon be delivered to New Hampshire, and that they had to sell it quickly because the "big guys" were coming to collect the money owed.

On April 8, 2009, Lopez and Garcia arrived at the Brown Avenue house, followed four days later by a truck carrying the cocaine. Soon after, the police videotaped Hernandez transferring cocaine into the trunk of a Cadillac parked behind the house, with Lopez standing 15 feet away, talking on a cellphone.

Later that day, law enforcement officers including a SWAT team executed a warrant to search the house and arrested its inhabitants. The agents found a bag of Lopez's personal items,

including a cellphone with information for contacting "Molina." They also found, in the living room where Lopez had slept for several nights, another cellphone, to which "Molina" placed a call the next day.  Ledgers seized had details of drug shipments and several references to Garcia and Lopez.  Finally, after drug-sniffing dogs confirmed the earlier surveillance evidence, the agents found a large amount of cocaine in the Cadillac parked behind the house.

I.

Although Lopez claims that the government's attempt to prove his membership in the conspiracy was inadequate, the evidence viewed in the light most favorable to the verdict, see United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009), adequately shows his agreement with others to distribute cocaine and posses it with that intent, see United States v. Famania-Roche, 537 F.3d 71, 78 (1st Cir. 2008) (government must show defendant knew of a conspiracy and participated in it with intent to agree with his co-conspirators and to commit the substantive drug offense). Testimony from a single witness can be enough to support a conviction, United States v. Meises, 645 F.3d 5, 12 (1st Cir. 2011), and here, two co-conspirators directly implicated Lopez in the scheme.  Ramirez testified that Lopez introduced him and Hernandez to Molina, who became the New Hampshire dealers'

-5-

principal cocaine supplier, while the testimony of Hernandez's girlfriend, Janeth Sarmiento, supported the inference that Lopez was one of the "big guys" who traveled to New Hampshire to collect money in arrears from the sale of cocaine. Telephone records revealed that Lopez frequently contacted Hernandez around the time of the major shipment of cocaine in March 2009, and Lopez was mentioned by name in the drug ledgers seized in the search of the house. Evidence showed that Lopez had communicated with Molina on several cellular telephones, through one of which Molina tried to reach Lopez the day after the raid. And of course Lopez was videotaped within 15 feet of the cocaine that Hernandez was moving to the trunk of the Cadillac. Summed up, this was enough evidence to allow a reasonable jury to find without serious question that Lopez was a conspirator.

The evidence just canvassed also blows cold on Lopez's challenges to the district court's attribution to him of over 150 kilograms of cocaine, which we review for clear error. United States v. Cinton-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010). Although a conspirator is responsible only for foreseeable conduct by members of the conspiracy (including himself) acting within the scope of the agreement (here, to distribute drugs), United States v. Laboy, 351 F.3d 578, 583 (1st Cir. 2003), the district court's conclusion by a preponderance of the evidence, see id., that Lopez had conspired to possess and distribute over 150 kilograms of

cocaine rested on the evidence that Lopez was the conduit to Molina, the major source of the cocaine. The court pointed to the many telephone contacts between Lopez and the other distributors, and cited evidence that large loads of cocaine were shipped north to New Hampshire using the same driver in similar trucks, and thus indicating Molina as their common source. It is reasonable to infer from all this that the cocaine shipments from Molina to Hernandez and Ramirez, which amounted to over 150 kilograms, were foreseeable by Lopez and fairly attributable to him.

## II.

Garcia's primary claim is one of error in letting law enforcement agents testify about the exciting way they executed the warrant at the Brown Avenue house. An FBI agent told how they used a SWAT team in anticipation of the firepower drug dealers usually command when transporting or storing large quantities of drugs, and a Manchester SWAT team member described the standard tactics used to subdue high-volume drug dealers like the defendants; here, the team used a "flash-bang" device, a non-lethal grenade that explodes with a stunning combination of light and noise, to freeze the inhabitants of the house at the moment the police enter. The officer went into the reasons for such aggressive tactics, and spoke of drug dealers as customarily armed, dangerous, and ready to fight.

Although Garcia now contends that this evidence was irrelevant and prejudicial in depicting the defendants as highly dangerous, he did not object to the testimony at trial, our review consequently being only for plain error. United States v. Perez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003). That is, he must show an error that was clear and obvious, affecting his substantial rights and seriously impairing the integrity of the judicial proceedings. United States v. Rios-Hernandez, 645 F.3d 456, 462 (1st Cir. 2011). Garcia cannot shoulder the burden.

To begin with, as the Government points out, the testimony about the flash-bang device and the immediate apprehension of the house's inhabitants helped to show that the conspirators were startled by the SWAT team's use of force, to the point of losing any opportunity to move or conceal anything within the house before the police took control. This evidence helped to establish that Lopez was probably the owner of a cellphone found in the living room where he had been sleeping and independently linked to calls in aid of the conspiracy.[1]

---

[1]Garcia objects that there was no testimony as to Lopez's whereabouts when the officers executed the search warrant and that evidence of the inhabitants' inability to move could therefore not link Lopez to the cellphone in the living room. But evidence that the inhabitants could not conceal items when the police arrived helped establish that the cellphone had not been moved and was, prior to the search, in the living room, where Lopez had been sleeping for several nights.

We do think that Garcia is right in arguing that the further testimony describing the Government's motivations for using force (the general propensity of drug dealers to be armed and paranoid) is less obviously relevant, and more prejudicially risky, than the account of the dramatic entry of the house. But it was not plain error to allow it. Descriptions of the background for police action can be relevant in preventing jury puzzlement at otherwise unexplained behavior, and law enforcement agents accordingly have some leeway to describe the course of their investigations in order to "set the stage for the testimony to come." United States v. Flores-De-Jesus, 569 F.3d 8, 19 (1st Cir. 2009). Here, the justification for the testimony was its hedge against any suspicion on the part of jurors that the police were being gratuitously militant and thus too zealous to be trusted, and we cannot identify any pivotal moment when this background evidence reached the stage when its threat of prejudice so clearly outweighed relevance that the judge was required to take action *sua sponte*, as defense counsel sat silent. See Fed. R. Evid. 403.

Nor has Garcia demonstrated that the evidence was so damaging to his substantial rights that it probably affected the outcome of his trial. See United States v. Gilman, 478 F.3d 440, 447 (2007) (on plain error review, a defendant "must show that the error was prejudicial in the sense that '[i]t must have affected the outcome of the district court proceedings'") (quoting United

States v. Olano, 507 U.S. 725, 734 (1993)).  Law enforcement officers testified that, in fact, these defendants turned out to be unarmed and cooperative, and the jury perfectly well would have understood that, notwithstanding the general possibility of violence that explained the force used in entering the house, the defendants neither employed actual violence in return nor were outfitted to do so.

Garcia points to United States v. Cunningham, 462 F.3d 708 (7th Cir. 2006), in which the Seventh Circuit ordered a new trial after a government agent testified to the remarkable number of government officers and agencies that signed off on a Title III wiretap order before issuance.  The court held the testimony irrelevant and prejudicial in showing that the officials who approved the application for the order all believed that the defendants were in fact committing drug-related crimes, with the effect of improperly bolstering the credibility of the prosecution's evidence.  Id. at 713.  But this case is far from Cunningham.  Not only did the defendants there object to the testimony at trial, entitling them to review for abuse of discretion, id. at 712, not the more onerous plain error standard, but the Cunningham testimony was irrelevant to anything but the weight to be given to the prosecution testimony, which the government was forbidden to bolster by resort to third-party belief.  Here, the testimony about executing the warrant helped

-10-

establish Lopez's connection to a cellphone, which in turn connected him to Molina, the source of the cocaine.

As a related matter, Garcia argues that the district court should have declared a mistrial after Hernandez's girlfriend testified that she had allowed Hernandez to use her house on Brown Avenue because she was afraid that he might harm her parents. She said that Hernandez had told her that he knew her "parents were in Mexico and that he knew where they were." Garcia did object to this, and the district court sustained the objection and allowed no further testimony on the point. Garcia did not, however, request a mistrial, and his claim that the district court should have declared one *sua sponte* is consequently reviewed like his other issues, for plain error. United States v. Smith, 101 F.3d 202, 212 (1st Cir. 1996). Again, he does not make the grade.

Hernandez's girlfriend did not testify that he threatened her parents directly, and her testimony was cut off before she could expand on the suggestion of even an indirect threat. The court could reasonably have assumed that it was sufficiently satisfactory to disallow any further testimony on the subject, there being no evidence that Garcia condoned or even had knowledge of any threat. There was thus no reason for the judge to have perceived any substantial prejudice to Garcia warranting a mistrial.

Finally, Garcia raises a third claim of plain error in the Government's reference at closing to the "Mexican" connection of the conspiracy, and argues that the cumulative effect of mentioning this together with the previous suggestions of drug violence was to inflame and prejudice the jury against the defendants to the point of reversible error, even absent objection. But this is simply far-fetched. The mention of Mexico was not error *per se*, for the prosecutor was entitled to point out that the drugs used in the alleged conspiracy were, in fact, from Mexico, given the evidentiary basis for saying so. See United States v. Ovalle-Marquez, 36 F.3d 212, 220 (1st Cir. 1994) (a prosecutor may mention the foreign origins of a conspiracy when there is evidence to support the statement). And it is difficult to see how reference to the Mexican association was likely to add anything to what generally informed jurors would know in any event, that high level drug trade is typically violent and that a lot of drugs come north from Mexico. Inflammation is even the less likely here, where the jurors heard evidence that these defendants carried no arms and engaged in no violence.

**Affirmed.**