[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-13653

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 16, 2012
JOHN LEY
CLERK

D.C. Docket No. 1:09-cr-20264-JLK-3


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

NIKO THOMPSON,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 16, 2012)


Before DUBINA, Chief Judge, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Niko Thompson appeals his convictions for conspiracy to possess with intent to distribute 500 or more grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii)(II), 846, and for possession of a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(e)(1). Thompson contests the sufficiency of the evidence on both counts and further argues that three trial errors merit reversal of the convictions: (1) a DEA agent's testimony at trial that Thompson was the "source of supply" for an indicted co-conspirator; (2) testimony at trial concerning the procedures used by the government to obtain legal authorization to conduct wiretaps and procure search warrants; and (3) allegedly improper comments by the prosecution during its closing argument. After thorough review, we affirm Thompson's convictions on both counts.

I.

Since Thompson challenges the sufficiency of the evidence against him, we consider the record in the light most favorable to the verdicts, drawing all reasonable inferences and resolving all credibility determinations in their favor. See United States v. White, 663 F.3d 1207, 1213 (11th Cir. 2011).

The essential facts are these. The case against Niko Thompson was the byproduct of a long-term investigation of the drug-related activities of Emmanuel Othello and Junior Sylvin by federal and state authorities. During the course of the

investigation, the defendant Thompson was released from prison in mid-November 2008, and his mother, Dakota Thompson, activated an iPhone around that time. The address listed in public records for Dakota Thompson was the same address as the one on Niko Thompson's driver's license.

On November 18, 2008, the DEA began a court-ordered wiretap interception of Junior Sylvin's cell phone calls. Law enforcement officials monitored some 10,000 calls on Sylvin's phone during the course of the wiretap, which lasted less than two months. Of particular note for our purposes is that approximately 123 of these calls were linked to the Thompson iPhone. On the first several days of the wiretap, Sylvin and Othello had at least two conversations in which they referred to "shit" or "shits" (apparently referencing drugs), including one in which they mentioned that the "shits" had been opened, that not all of them had been used, and that two were left. In a later call during the wiretap, Sylvin and Othello compared the "shit" they had received from both "Coach" and "Cut." Othello additionally stated that "Coach" had "just got out" and could not take certain chances.

On November 28, 2008, what appears to have been a drug transaction involving Sylvin, Othello, and Thompson occurred. Sylvin instructed Othello to buy "shit" and "keys" from "Coy." Notably, Sylvin told Othello that the number to call was the number registered to the Thompson iPhone. Several phone calls between

Sylvin and Thompson followed in which the defendant Thompson said that "Monk" -- a nickname for Othello, according to a DEA agent's testimony at trial -- had not yet come to see him. Sylvin eventually said that he would meet Thompson and that he would get the "shit" in exchange for "bread." Thompson told Sylvin to meet him where Sylvin had gone "yesterday," seemingly referring to a house on N.W. 139th Street in Miami to which Thompson had given Sylvin directions the day before. The trial testimony of government agents described the residence on N.W. 139th Street as a "stash house" in which several documents linked to Gordon Louis, an indicted co-conspirator, had been found.

On December 5, 2008, another ostensible drug transaction took place. This time, Sylvin told Othello that what he was "finna get from [Coach] today" was "out of there" and that he was "gon' make $1800." An intercepted phone call shortly thereafter showed that Sylvin agreed to "see what was up" for Ziv Bythol, an individual whom Sylvin supplied with drugs. An hour later, Sylvin called the defendant Thompson and told Thompson that he was outside the N.W. 139th Street house. A DEA agent observed Sylvin enter the home, remain inside for fifteen minutes, and then depart for Othello's home. Sylvin and Othello traveled in separate vehicles to Bythol's home, where they stopped for approximately ten minutes. Upon arriving back at Othello's residence, Sylvin told Bythol on the phone that he didn't

"know about the 18" but that he would "probably get half of the 18." Sylvin called Thompson immediately thereafter and asked, "half of that what I just hauled ass with, right?" A few minutes later, Thompson told Sylvin that he would "give [Sylvin] what [Sylvin] left with tomorrow."

A member of the Miami Police Department's narcotics squad stopped Sylvin's vehicle on December 8, 2008. The officer called a K-9 unit; upon arrival, the dog alerted vigorously to the vehicle. A search revealed twenty-one individually wrapped bags of cocaine and a firearm. The officers seized 581 grams of cocaine and the firearm but did not arrest Sylvin. Sylvin and Thompson had still another conversation three days later where Sylvin mentioned "the shit [I] just lost."

On January 10, 2009, law enforcement agents executed a court-ordered search warrant at Emmanuel Othello's residence. Othello, along with his brother and another woman, were present during the search. Inside the main house, the authorities found $4,000 in cash, a gun holster, a strobe light similar to those used by unmarked police vehicles, and a digital scale. A separate court-ordered search warrant of another structure in the back of that property revealed $37,790 in cash bound with rubber bands, orange baggies, a heat sealer, rubber bands, ammunition, a kilogram press, a room deodorizer, and a large white bag containing a substance used to dilute cocaine.

5

On April 6, 2009, law enforcement officials executed an arrest warrant for the defendant Thompson and a court-ordered search warrant at the house where he was staying. At approximately 6:40 A.M., an ATF team forcibly entered the residence and arrested Thompson in a back bedroom. The search of the house revealed a Beretta firearm underneath the right side of the mattress and a loaded magazine in the nightstand in the same bedroom. Next to the nightstand was the iPhone with the phone number registered to Dakota Thompson. Billing statements from several companies (FP&L, AT&T, and ADT) were addressed to Niko Thompson at the address being searched. Several children and April Walker, Thompson's fiancée, were also present at the scene.

Thompson was tried individually in May 2010. The only witness called by the defense was Walker. She said that the gun was underneath her side of the bed and that she slept closest to the nightstand. She added that "two or three days prior" to the raid she had found the gun in the glove compartment of a rental car that Gordon Louis had borrowed from Walker. Walker claimed that she told Louis to retrieve the firearm and that she then hid it from the children. She offered that Thompson had been out of town for approximately one week "doing music" in Tampa and did not know about the firearm because he returned at 3:00 or 4:00 A.M. on the morning of the raid. Walker also claimed that the authorities at the scene were trying to coerce

6

her to say that the gun belonged to Thompson.

The Government sought to rebut Walker's testimony by calling ATF Agent Stefani Stankiewicz. According to Stankiewicz, Walker said on the the morning of Thompson's arrest that she had found the gun in one of Thompson's rental vehicles approximately three weeks before the raid, called Thompson to find out what to do with it, and then placed the firearm inside the house pursuant to Thompson's instructions. Walker observed on the morning the search warrant was executed that the firearm could have belonged to "G," a nickname for Gordon Louis, since Louis and Thompson would go shooting at a gun range together.

The defendant was convicted on the felon in possession charge and the conspiracy to possess with the intent to distribute 500 or more grams of cocaine involving Sylvin and Othello, but he was acquitted on a separate charge of conspiracy to possess with intent to distribute 500 or more grams of cocaine involving alleged co-conspirator Gordon Louis. Thompson was sentenced to a total of twenty years imprisonment and eight years of supervised release, in addition to being assessed $200. This timely appeal followed.

## II.

## A.

Several standards of review govern this appeal. Thompson's challenges to the

sufficiency of the evidence are reviewed de novo. United States v. White, 663 F.3d 1207, 1213 (11th Cir. 2011). In reviewing the sufficiency of the evidence, "we look at the record in the light most favorable to the verdict and draw all reasonable inferences and resolve all questions of credibility in its favor." Id. (internal quotation marks omitted). A jury's guilty verdict will not be disturbed unless no reasonable trier of fact could have found guilt beyond a reasonable doubt. Id. All of the purported trial errors cited by Thompson are reviewed for plain error because none of them was accompanied by a contemporaneous objection. See United States v. Hoffman-Vaile, 568 F.3d 1335, 1340 (11th Cir. 2009) (evidentiary issues); United States v. Pendergraft, 297 F.3d 1198, 1204 (11th Cir. 2002) (improper closing argument); United States v. DeJean, 613 F.2d 1356, 1360 (5th Cir. 1980) (alleged comment on defendant's failure to testify).[1]  "Plain error occurs where (1) there is an error; (2) that is plain or obvious; (3) affecting the defendant's substantial rights in that it was prejudicial and not harmless; and (4) that seriously affects the fairness, integrity or public reputation of the judicial proceedings." United States v. Hall, 314 F.3d 565, 566 (11th Cir. 2002). "In most cases, a determination of whether error affects a substantial right turns upon whether it affected the outcome of the

---

[1]In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

8

proceedings." Id. (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." Olano, 507 U.S. at 734. Although the claimed trial errors are reviewed for plain error, Thompson's claim that the cumulative impact of the errors requires reversal is reviewed de novo. See United States v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007) (per curiam).

B.

Thompson challenges the sufficiency of the evidence as to both the conspiracy charge and the felon in possession charge. We analyze each charge in turn.

"To support a conspiracy conviction under 21 U.S.C. § 846, the government must prove that there is an agreement by two or more persons to violate the narcotics laws," which requires proving beyond a reasonable doubt the defendant's "knowledge, intent, and participation." United States v. Parrado, 911 F.2d 1567, 1570 (11th Cir. 1990). "Because a conspiracy is generally secretive, a reasonable factfinder may infer its existence from the surrounding circumstances." United States v. High, 117 F.3d 464, 468 (11th Cir. 1997) (per curiam).

We begin with the obvious: the defendant does not contest that co-conspirators Sylvin and Othello operated a drug business. Morever, it was perfectly reasonable for the jury to find on this record that the iPhone activated by Thompson's mother

9

around the time of his release from prison -- and later discovered within Thompson's reach when he was arrested -- was, in fact, Thompson's phone. The fact that the unique numerical identifier located on the phone's SIM card matched the phone records dating from the original purchase further supports this inference. Moreover, a DEA agent testified at trial that Thompson's voice, which the agent heard during Thompson's arrest, matched the voice he heard repeatedly on the wiretapped conversations that were linked to the iPhone. There was also ample evidence to conclude that "Coy" and "Coach" referred to the defendant, since the phone number linked to the iPhone was given by Sylvin to Othello as "Coy's" phone number. Sylvin also told Othello that "Coach" could not take any chances because "he just got out," an obvious, if inferential, reference to the fact that Thompson was just released from prison two to three weeks earlier.

There were also many phone calls involving coded discussions of drugs that were linked to Thompson's nicknames -- such as Othello "mak[ing] more bread off of Coach's shit," Sylvin instructing Othello to purchase "shit" from "Coy," and the defendant Thompson stating that he would "give [Sylvin] what [Sylvin] left with tomorrow." This was more than sufficient to enable the jury to find beyond a reasonable doubt that Thompson had conspired as charged with Sylvin and Othello to possess cocaine with the intent to distribute. Finally, we believe that the admission

10

of Thompson's two prior convictions for possession of cocaine with intent to deliver also support the finding that the defendant had the requisite intent to commit the charged drug offense.[2] See United States v. Calderon, 127 F.3d 1314, 1332-33 (11th Cir. 1997).

To support a conviction for a felon in possession charge, the United States had to prove beyond a reasonable doubt: (1) that Thompson was a convicted felon; (2) that he knowingly possessed a firearm or ammunition; and (3) that the firearm or ammunition was in or affected interstate commerce. See United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004). Thompson contests only the second element, knowing possession. It is by now hornbook law that possession of a firearm may be "either actual or constructive." United States v. Sweeting, 933 F.2d 962, 965 (11th Cir. 1991). "Constructive possession exists when the defendant exercises ownership, dominion, or control over the item or has the power and intent to exercise dominion or control." United States v. Greer, 440 F.3d 1267, 1271 (11th Cir. 2006). Possession may also be "joint or sole." United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004) (per curiam). "The defendant may exercise . . . dominion and control either directly or through others." Id. at 1235. Finally, possession may be shown

---

[2]Thompson had twice pled guilty in Florida state court, once in 2004 and again in 2007, to felony charges of possession of cocaine with intent to deliver.

11

either circumstantially or by direct evidence. United States v. Crawford, 906 F.2d 1531, 1535 (11th Cir. 1990).

On this record, there was ample evidence for a reasonable factfinder to conclude beyond a reasonable doubt that Thompson knowingly possessed the weapon. Even if Thompson possessed the gun in conjunction with Walker, he would still be guilty of joint constructive possession of the weapon. There was a strong body of evidence linking Thompson to the house and the bedroom where the gun was found. That the defendant was sleeping on the very bed under which the firearm was secreted, in addition to having his iPhone confiscated from the nightstand where the ammunition was found, amply supports the conclusion that he "ha[d] the power and intent to exercise dominion or control" over the weapon. See Greer, 440 F.3d at 1271. DEA Agent D'Ambrosio also testified that both the gun and the ammunition were found on the same side of the bed where D'Ambrosio first observed the defendant five to ten minutes after the search began.

## III.

We turn then to three different sets of statements made at trial that the defendant claims amount to reversible error and to cumulative error. We review them individually for plain error only because there were no contemporaneous objections interposed at the trial.

First, Thompson says that a DEA agent's testimony that Thompson was Junior Sylvin's "source of supply" was reversible error. During the direct examination of the agent by the United States, the prosecutor asked how Thompson became a subject of the investigation into Sylvin. The agent answered that "we determined that Mr. Thompson was Junior Sylvin's source of supply" after surveillance and phone conversations suggested Thompson's involvement.

The government suggests that the statement was made simply to provide the jury with a brief background explaining how it came to focus on the defendant, and that, at all events, the fact that Thompson was actually Sylvin's source of supply was amply established by independent evidence at trial. But even if we were to assume that this singular comment was error, it was not plain error. The agent's remark was an isolated one that was not used by the prosecution in its closing argument or in any other way, and it arguably did have some explanatory value as to how Thompson became involved in the investigation. Moreover, the core of the prosecutor's theory of the case and the overwhelming amount of independent evidence suggesting that Thompson was indeed Sylvin's cocaine supplier vitiates any finding that Thompson's substantial rights were affected by the statement, let alone that the fairness or integrity of the judicial proceedings were seriously affected. See Hall, 314 F.3d at 567.

Thompson also claims that two instances where federal agents testified at trial

13

concerning the procedures involved in obtaining wiretap and search warrant authorization were plain errors mandating the reversal of his convictions. The first occurred when the government asked DEA Agent Rainwater on direct examination about how wiretap authorization works. The agent answered that he typed an affidavit "reviewed by the U.S. Attorney" and said that a federal judge authorized the monitoring of Sylvin's cell phone. The second putative error involved DEA Agent Rosenfeld, who testified, albeit only on redirect examination, that law enforcement officers first had to obtain a warrant before conducting house searches, a process that he described as "writ[ing] an affidavit . . . to prove to a Judge that there is probable cause." Notably, Agent Rosenfeld's testimony regarding the process of obtaining search warrants and wiretap authorization occurred in response to defense counsel's cross-examination questions, which had established that the authorities were unable to visually confirm who or what they suspected to be inside buildings during the course of the wiretaps.

It is not altogether clear that the admission of these statements constituted error, much less plain error. Compare United States v. Hendrix, 509 F.3d 362, 372-73 (7th Cir. 2007) (finding that reference to search warrant authorization was proper in situation involving "no extensive testimony proffered to explain the procedure of obtaining a search warrant"), with United States v. Cunningham, 462 F.3d 708, 712-

14

14 (7th Cir. 2006) (concluding that lengthy discussion of procedures used in obtaining legal authorization for wiretap was irrelevant, unfairly prejudicial, and constituted impermissible bolstering, requiring reversal of conviction). Although the existence of legal authority to conduct a search or wiretap is, of course, a legal determination for the district court to make in the first instance, the fact that there is legal authorization for a search or wiretap may be germane at trial, particularly where the defense has attacked, confronted, or cross-examined the agent's good faith or the nature and quality of the investigative process itself. After all, a brief reference noting that a neutral and detached magistrate authorized a search or wiretap demonstrates that a court had permitted the intrusions at issue, which may be a fact of considerable relevance to a jury. See Hendrix, 509 F.3d at 372-73; Cunningham, 462 F.3d at 714 (finding admissible a statement by "a government witness, when telling his story to the jury, to say a search warrant had been obtained, and then the search was made").

In this case, the lengthier discussion between the prosecution and Agent Rosenfeld was clearly in response to defense counsel's attempt to question the quality and thoroughness of the investigation conducted by law enforcement officials. But, even if we were to assume that it was error to admit this testimony, on the facts of this case it is not clear that the error was plain or obvious, particularly when it came after

15

the defendant's lengthy cross-examination of the agent. Perhaps more significantly here, the defendant Thompson cannot show that his substantial rights were affected, much less that the putative errors "seriously affect[ed] the fairness, integrity or public reputation of the judicial proceedings." Hall, 314 F.3d at 566. The prosecution did not argue to the jury in closing that the legal authorization for the searches and wiretaps constituted evidence of Thompson's guilt; only Thompson's attorney used this testimony in his closing argument to ask the jurors rhetorically whether law enforcement lacked probable cause to seek a wiretap of Thompson's phone. Moreover, the jury's acquittal of Thompson on the charge of having conspired with Gordon Louis is "telling proof" that the jury was not prejudiced by this testimony and that any claimed "impropriety was isolated and certainly did not permeate the entire trial." See United States v. Rodriguez, 765 F.2d 1546, 1560 (11th Cir. 1985).

Finally, Thompson claims that three different statements by the prosecutor in his closing argument either standing alone or in concert require reversal. The purported errors include: (1) the prosecution's comment allegedly regarding Thompson's failure to testify; (2) the prosecution's statement about the credibility of Walker, the defense's only witness; and (3) the prosecution's comment about the defendant Thompson supposedly telling Walker to lie on the stand on his behalf. All three closing remarks at issue again are reviewed only for plain error because defense

16

counsel raised no objections to any of them at trial.  See United States v. Schmitz, 634 F.3d 1247, 1259 (11th Cir. 2011); United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997) (citing Fed. R. Crim. P. 52(b)) ("When a defendant fails to object to the prosecutor's closing argument, relief is available to rectify only plain error . . . ."); United States v. DeJean, 613 F.2d 1356, 1360 (5th Cir. 1980) (reviewing putative comment on defendant's failure to testify for plain error in the absence of a contemporaneous objection).

First, Thompson claims that the prosecution violated the Fifth Amendment by commenting on his failure to testify.  See Griffin v. California, 380 U.S. 609, 613 (1965). The prosecutor said, "[Thompson's attorney] and Niko Thompson[,] for that matter, cannot answer . . . what is inside this binder [of phone conversation transcripts], what the defendant's own words are."  This statement by the prosecutor was not error at all.  "A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."  United States v. Thompson, 422 F.3d 1285, 1299 (11th Cir. 2005).  The "prosecution is entitled to refer to the fact that the defense has failed to rebut a natural inference that may be drawn from the facts in evidence."  United

States v. Griggs, 735 F.2d 1318, 1323 (11th Cir. 1984) (per curiam) (emphasis added). The prosecutor's statement clearly fits this use, and thus Thompson cannot meet the first prong of this test. The "natural inference" drawn from the phone calls was that they referred to drug trafficking. The prosecutor's comment went to the proceeds of the wiretap intercepts, not to the defendant's failure to testify. Moreover, our case law also holds that a jury must view the comment "necessarily" as commenting upon the defendant's failure to testify; the mere possibility or probability that the jury could so construe the comment is insufficient. United States v. Knowles, 66 F.3d 1146, 1163 (11th Cir. 1995). The jury could readily have interpreted this comment as emphasizing that the defense had not countered the clear factual inference that the phone calls referred to drugs, and thus Thompson cannot meet the second prong of the test, either. In short, we can discern no error in this statement, let alone plain error that substantially affected the defendant's rights, or seriously affected the fairness or integrity of the proceedings. The focus was on the contents of the transcripts, and their evidential value was obvious.

Thompson also says that it was error for the prosecutor to say in closing that, "in my opinion, the biggest lie of all that [April Walker] told" was that Thompson was out of town the week prior to his arrest, a fact that was contradicted by surveillance of Thompson in South Florida by law enforcement during the same

18

timeframe. It is well-settled that an attorney "must refrain from interjecting personal beliefs into the presentation of his case." United States v. Young, 470 U.S. 1, 8-9 (1985). However, "the prosecutor may suggest what the jury should find from the evidence before it." United States v. Bernal-Benitez, 594 F.3d 1303, 1315 (11th Cir. 2010). Whether the prosecutor's assertion was improper is not clear, since the comment preceded a detailed factual recitation providing the foundation for the government's argument that Walker was lying. See United States v. Schmitz, 634 F.3d 1247, 1270 (11th Cir. 2011). But, even if the prosecutor's statement were error, this was not in context plainly so, and it did not affect Thompson's substantial rights. Walker's testimony was weakened significantly by the testimony of Agent Stankiewicz, who said that Walker had told her that Thompson knew of the gun and instructed Walker what to do with it. It was wholly unlikely that the prosecutor's statement would have affected the jury. Moreover, there was a substantial body of evidence to convict Thompson on the felon in possession charge (including sleeping on the very bed under which the gun was found) -- the only count for which Walker's testimony was relevant. See United States v. Molina, 443 F.3d 824, 830 (11th Cir. 2006). The prosecutor's statement was not plainly erroneous.

Finally, Thompson contends that the prosecutor's statement that Walker "completely and absolutely perjured herself" and that Thompson induced Walker

19

prior to the trial to "make up a story" on his behalf -- an assertion without any factual support -- constituted reversible error. The admission of the statement that the defendant induced witness Walker to lie was an obvious error, which the United States has conceded. See Oliver v. Wainwright, 795 F.2d 1524, 1532 (11th Cir. 1986) (per curiam) ("While a prosecutor may point out that record evidence suggests that a witness may have had some reason to testify as the defendant wished, he or she may not suggest that the defendant has suborned perjury where such a suggestion finds no support in the record."). However, Thompson has not made the requisite showing that his substantial rights were affected, let alone that "the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (quoting United States v. Cotton, 535 U.S. 625, 631 (2002)). As in Oliver, the alternative scenario offered by Walker "was so weak and full of inconsistencies that the prosecutor's insinuation could not have rendered the trial fundamentally unfair." 795 F.2d at 1532. "Given the inconsistency and vagueness of the defense, the jury could have disbelieved the alibi testimony altogether," and it "had ample reason" to do so in light of Agent Stankiewicz's testimony. Id. In short, as for this comment, we cannot find that there was "a reasonable probability that the error affected the outcome of the trial," United States v. Marcus, 130 S. Ct. 2159, 2164 (2010), and thus the defendant's substantial

20

rights were unaffected. This comment, while improper, did not amount to plain error. We add that the judge instructed the jury that the lawyers' comments and arguments were not evidence in the case.

Thompson also says that the cumulative impact of the alleged errors requires reversal. We remain unpersuaded. Here the whole is not greater than the sum of its parts. The defendant either has failed to show error at all, or that any error was plain, or, finally, that it affected his substantial rights individually or cumulatively. See United States v. Baker, 432 F.3d 1189, 1223-24 & n.40 (11th Cir. 2005).

**AFFIRMED.**